Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/06/2018 08:11 AM CST

Samantha L. Kashyap, appellant,
v. Shaan S. Kashyap, appellee.
___ N.W.2d ___

Filed November 6, 2018.    No. A-17-906.

1.  **Divorce: Appeal and Error.** In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.

2.  **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In actions for dissolution of marriage, an appellate court reviews the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees de novo on the record to determine whether there has been an abuse of discretion.

3.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

4.  **Child Custody: Appeal and Error.** In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

5.  **Child Custody.** When deciding custody issues, the court's paramount concern is the child's best interests.

6.  ____. In determining the best interests of a child in a custody determination, a court must consider pertinent factors, such as the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child.

7. ____. The fact that one parent might interfere with the other's relationship with the child is a factor the trial court may consider in granting custody, but it is not a determinative factor.

8. ____. A court must determine that joint custody (legal or physical) is in a minor child's best interests regardless of any parental agreement or consent.

9. ____. In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.

10. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation.

11. **Child Custody.** In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the child, a court should consider the following factors: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent.

12. ____. The list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted.

13. **Child Custody: Visitation.** Consideration of the impact of removal of children to another jurisdiction on the noncustodial parent's visitation focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Andrew M. Ferguson, of Carlson & Burnett, L.L.P., for appellant.

Kelly T. Shattuck, of Vacanti Shattuck, for appellee.

Moore, Chief Judge, and Bishop and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

The Douglas County District Court dissolved the marriage between Samantha L. Kashyap and Shaan S. Kashyap. Although Samantha was initially granted the temporary care, custody, and control of the parties' minor child, and the parties subsequently agreed to joint legal custody in a mediated partial parenting plan, the district court ultimately awarded the legal and physical custody of the child to Shaan. In doing so, the district court expressed concern about Samantha's interference with Shaan's parenting time, along with other issues. The district court also granted Shaan's request to remove the child from Nebraska to Arizona, where Shaan was stationed in the military. Samantha was ordered to pay child support. Samantha appeals, challenging the district court's decision on custody, removal, and child support. We affirm.

## II. BACKGROUND

The parties were married on February 8, 2012, in Omaha, Nebraska, and their daughter, Liliana Kashyap (Lily), was born in August 2013. (We note that the parties' testimony suggests the marriage was in 2013, but documents in the transcript indicate otherwise. Also, the parties' testimony conflicts with documents in the transcript regarding Lily's birth year being 2012 or 2013. Therefore, we have relied on the dates provided in the decree dissolving the parties' marriage.) In August 2015, Shaan, a staff sergeant in the U.S. Air Force, was stationed in England when Samantha decided to leave England

and return to Omaha, taking Lily with her. Samantha then moved from Omaha to an apartment in Ashland, Nebraska, in February or March 2016. Samantha filed a complaint for dissolution of marriage on June 23 in the Saunders County District Court; Shaan filed an answer and counterclaim shortly thereafter, and it indicated he was still stationed in England. He requested "large blocks" of parenting time, since Lily was not yet of school age.

An order filed on August 8, 2016, placed temporary custody with Samantha and granted Shaan "FaceTime" with Lily three times per week. Any other parenting time was to be by agreement when Shaan was in the United States. Shaan was ordered to pay $521 per month in temporary child support commencing August 1, and the parties were ordered to equally share daycare costs. The divorce action was transferred to the Douglas County District Court in December, because Samantha moved from Ashland back to Omaha in September.

On February 17, 2017, Shaan filed a motion for further temporary orders. He claimed that Samantha had two other children with different fathers and had lost custody "due to her instability and inability to cooperate." He stated that he had not been allowed to exercise parenting time with Lily, that Samantha refused to communicate in any meaningful way, and that she had denied him "all access" to Lily.

A hearing took place on March 8, 2017, although the order setting forth the court's orally pronounced decision was not formally filed until July 10. The court awarded Shaan parenting time with Lily while he was in Omaha from March 8 to 14. The March 8 parenting time was to take place from noon until 8 p.m., and the parties were to meet at the "Omaha Zoo"; Samantha was permitted to be present for this parenting time. The parties were ordered to mediate a parenting plan, including a parenting schedule for the upcoming summer, since Shaan would be at a military base in Arizona by May. The parties were ordered to exchange and keep current their addresses and contact information.

The next day, March 9, 2017, Shaan filed a "Motion to Compel Parental Visits." It indicated that based on the parenting schedule set out by the court at the hearing on March 8, the parties were to have met at the zoo for Shaan's parenting time with Lily. However, Samantha sent a text message claiming an emergency and altered the meeting time and place to 4:30 p.m. at a shopping mall. The motion alleged that Samantha showed up with a boyfriend (and his child) and that they stayed until only 7:15 p.m., despite the court's order that parenting time was to last until 8 p.m. Shaan alleged he had been in town nearly a week and was refused parenting time until the court-ordered March 8 time, which Samantha altered. Shaan requested an order compelling Samantha to abide by the court's terms as set out at the March 8 hearing. A hearing took place on March 10. When the court asked Samantha why she had not complied with its order, Samantha replied she had to get her medication and "needed the forms filled out on base . . . because our ID's expired" and so she had to get that done. She also claimed to have "female issues" that necessitated her returning home. After confirming what the parenting time arrangements were going to be, the court advised the parties, "When I issue an order, I expect the order to be complied with," and "[i]f there's a problem, then the parties all need to know what the problem is and they have to resolve it mutually." The court further cautioned that it would "look and see how the parties act during this period of time" because it helps the court "make a good decision as to what's in the best interest of the child long term."

A mediated partial parenting plan was filed May 15, 2017. The parties agreed to joint legal custody and holiday parenting time, but could not agree on physical custody or regular parenting time.

Trial took place on July 18, 2017, and the district court orally pronounced its decision the next day. A decree dissolving the marriage was entered July 26; it awarded legal and physical custody of Lily to Shaan, granted Shaan's request to remove Lily to Arizona, and ordered Samantha to pay child

support. The evidence from trial and the court's findings will be set forth as relevant below.

## III. ASSIGNMENTS OF ERROR

Samantha assigns that the district court abused its discretion by (1) granting Shaan sole legal and physical custody of the parties' minor child, (2) granting Shaan permission to remove the child from Nebraska to Arizona, and (3) ordering Samantha to pay child support.

## IV. STANDARD OF REVIEW

[1,2] In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

[3] An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

[4] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

## V. ANALYSIS

### 1. Custody

Samantha claims the district court abused its discretion by awarding legal and physical custody of Lily solely to Shaan. She argues, "It was an abuse of discretion for the court to award legal custody to Shaan alone." Brief for appellant at 12. And she argues that "sole physical custody should have been

granted to [her] because Shaan moved to another jurisdiction." *Id*. at 13. These arguments indicate that Samantha is not opposed to joint legal custody of Lily, but that physical custody should have been awarded to her.

[5] When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

[6] Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

### (a) District Court's Decision

Following trial on July 18, 2017, the district court directed the parties to return the next day for the court's oral pronouncement

of its decision. On July 19, the court stated to the parties, in relevant part:

> The Court finds that [Shaan] is a fit and proper parent to be awarded [Lily's] custody, and as such the Court awards the sole legal and physical custody of [Lily] to [Shaan]. The Court finds that [Samantha] is not a fit and proper person to have custody of [Lily].
>
> The Court notes that the parties have agreed to joint legal custody. The Court is rejecting their stipulation . . . . And the reason for the Court's rejection of this is the parties do not communicate. [Samantha] has done whatever she can to thwart any type of meaningful and appropriate contact between [Lily] and [Shaan].
>
> [Samantha,] I'm finding that you are not [a fit and] proper person to be awarded custody of this child, number one, you have thwarted . . . all reasonable efforts by [Shaan], the father, to have appropriate contact with [Lily]. You have prevented that, which is absolutely inappropriate. You have a huge problem with veracity. You don't tell the truth very well. You're not stable. You're going from house to house. You do not make good decisions for [Lily]. You've introduced some other man, stranger, to [her] when you're still married, and [she] has been living on and off with your boyfriend now for the last year, which is inappropriate. You also have some morality issues that are a concern for the Court.
>
> As to [Shaan], the Court finds that he is the best parent in this case and it's in the best interest of [Lily] to be placed with him.
>
> The Court never likes to split up the geographical locations of the parties and the Court understands that that sometimes is necessary. The best interest of the child is . . . for the parents to remain married and have a stable environment. You people chose not to do that. The next thing for the best interest of the child is [for] the parents

to get along. You people can't do that. The next best interest for the child is that the parent[s] live in the same city. That can't be done in this matter.

And, [Samantha], you chose not to do that when you decided to move from England when you were still married to [Shaan].

The Court's also concerned, [Samantha], as to your lack of parental time with your other two children that are your daughter and your son. The excuse that you . . . may have cervical cancer, the doctor thinks you had that in May, it just doesn't hold any water, it doesn't hold any weight, it doesn't hold any logic. Assuming you even do have that condition, you still have an obligation to have appropriate contact with your children.

You also haven't paid your child support obligation for those children and there was no reason, good reason shown, why that was not the case.

Also, one of the things I look at is the parent that receives the custody, which parent is more likely to make sure the child has an appropriate relationship with the other parent. In this case, it's a given that it's the father, [Shaan], and you, [Samantha], because you've had the opportunity for the last two years and you've done whatever you can to thwart that.

Even if I assumed you were a fit and proper parent, I would still grant the custody to [Shaan] and allow him to move to Arizona. The legitimate reason for him to move there is . . . his position with the Air Force. . . .

The quality of life that [Lily] will have, she'll be with the parent that I believe will foster a good relationship with the other parent. It's in the best interest for her emotionally, physical[ly], to be with [Shaan].

The housing she'll have there is better than here in Omaha . . . you go between two and three houses. If I left [Lily] here, all it's going to do is cause more court battles because . . . I believe that you're a creature of habit and

. . . you'll continue to act as you have preventing any type of meaningful contact between [Shaan] and [Lily].

The July 26, 2017, decree set forth, in part, the above findings.

### (b) Samantha's Argument

Samantha initially argues that the district court abused its discretion by finding her unfit to have custody. We find it unnecessary to address Samantha's parental unfitness argument, because the court specifically held that it would have made the same decision even if it concluded Samantha was a fit and proper parent. Therefore, in our de novo review of the record, we will similarly assume parental fitness and focus only on whether the district court abused its discretion by awarding Shaan sole legal and physical custody based on the evidence presented.

Samantha contends it was an abuse of discretion for the court "to consider Samantha's relationship outside her marriage because the court made no finding that it negatively impacted [Lily]." Brief for appellant at 9. She argues that the court "cabined [its] finding as one solely of 'morality.'" *Id*. Samantha further argues that she "had been making most, if not all, major decisions" relating to Lily and that there was no evidence showing any negative impact on Lily. *Id*. at 11. Therefore, Samantha challenges the court's finding that she did not make good decisions for Lily, arguing that the court recited "what it perceives as Samantha's personal shortcomings," rather than stating how Lily has been negatively impacted by Samantha's actions. *Id*.

Samantha claims the court "wholly failed to recognize that Samantha had been the primary caregiver for [Lily] for her entire life" and that Shaan "had not cared for [Lily] overnight since August 2015." *Id*. She states that "Shaan's relationship with [Lily] was essentially limited to phone calls and FaceTime" and that "[t]hese are not [the] proper foundations upon which a grant of custody should be supported." *Id*.

Finally, Samantha contends that Shaan's "ability to parent and care for [Lily] full time was speculative at best." *Id*. at 12. As for Shaan's assertion that his parents would be helping him care for Lily, Samantha says this was only speculation, since neither of Shaan's parents testified. Samantha claims Shaan's ability to parent is speculative, whereas "[t]here is no speculation needed regarding Samantha's ability to care for [Lily], because she [has] been the sole provider for all [her] needs for the past two (2) years." *Id*.

### (c) Evidence

Samantha testified that she was 28 years old and was residing half the time in her parents' home in Omaha and half the time at her boyfriend's apartment in Gretna, Nebraska. Lily shares a room with Samantha when staying at Samantha's parents' home, but has her own bed. Lily has her own room when staying at Samantha's boyfriend's apartment, unless the boyfriend's 6-year-old daughter is also present, then the children share a room. Samantha had graduated from a cosmetology school in January 2017 and was about to start a new, full-time job as a hairstylist.

Shaan testified that he was 36 years old and was a jet engine mechanic, with about 6 years left before he planned to retire from the Air Force with 20 years of service. He said he will be finishing his military service at his current assignment in Arizona, with no risk of any temporary deployments. Shaan was renting a three-bedroom house in a neighborhood near the military base; Lily would have her own bedroom and bathroom there.

### (i) Other Children

Shaan and Samantha each have children from past relationships. Shaan testified that he has an 11-year-old son; the son's mother is also in the Air Force and has physical custody of their son. Samantha has two other children; each has a different father. Samantha testified that she has an 8-year-old daughter (older daughter) and a 6-year-old son. At the time of trial in

July 2017, Samantha was restricted to supervised parenting time with her older daughter as a result of sexual contact allegations involving Samantha's teenage brother (who was also living in her parents' home) and Samantha's older daughter. Her last supervised parenting time with her older daughter took place in May 2017. Samantha explained she had been "extremely busy with work" and not able "to have times that cooperate with each other."

The father of Samantha's 6-year-old son testified that he had sole custody of their son. Samantha was provided alternating weekend parenting time and one evening per week; however, she had not exercised any parenting time with their son since April 2017. According to Samantha, this was because she was "dealing with some health issues and was not wanting to bring it to [her son's] attention." When pressed by the court's questions for more of an explanation on this, Samantha said that her doctor told her in May 2017 there was a "good chance [she] had cervical cancer" and that she was still undergoing testing and had not yet had a biopsy done. The court expressed concern that 2 months had passed from when the doctor thought she might have cervical cancer and that no biopsy had been done yet. Samantha responded there was a scan that had to be done 2 weeks ago, "and they were trying to determine if it was bad enough to have to get a biopsy done" or if it "[wasn't] as serious as what they were thinking." Although she did not know whether she had cervical cancer, she did not spend time with her son because when he was between the ages of 2 and 4, "he watched his grandmother go through it and I don't want him to watch me go through it . . . and I'm just having a really hard time dealing with it." When asked how her son knew about his grandmother's cancer, Samantha said, "Because she talked about it constantly . . . I feel like she showed it off. I mean, she still walks around with her monitor on her." Upon this questioning from the court, Samantha said this was the same reason she had not seen her older daughter since May. When asked why she would not see her children

before knowing if she had cancer or starting any cancer treatments, Samantha replied, "I don't know. I've just been trying to push it away . . . ."

The father of Samantha's 6-year-old son also testified that Samantha was ordered to pay $200 per month in child support and that he thought she was about $8,000 behind in child support. The father also said that Samantha asked him "to write a letter to help her out in court," which would say that she was paying her child support and was current. According to the father, Samantha wanted him to lie because "it would help her out." Samantha testified otherwise. She claimed that she was talking with her son's father about how to pay her back child support and that she asked if he would write a letter about why Samantha is "a good enough parent for Lily and [Lily] shouldn't go overseas, but that was it." Samantha testified it had nothing to do with lying about paying off child support.

### (ii) Past Criminal Matters

Samantha testified about a couple past criminal charges. On December 31, 2016, Samantha hit her current boyfriend in the face. Samantha was charged with assault, but ended up pleading to disorderly conduct. Samantha explained that at the time, she had recently had a miscarriage so her "hormones were a little bit out of whack to say the least because I was upset." She was taking painkillers, and she and her boyfriend argued and she hit him in the face. She served 2 days in jail. And then in 2012, Samantha was charged with assault and negligent care of a minor; the negligent care of a minor charge was dismissed, and she pled to disturbing the peace. Samantha said that charge arose when her older daughter acted out and said hateful things to Shaan. "[S]he got out of control and started throwing a fit and so I spanked her," and the older daughter's father claimed a bruise on the older daughter's "bottom" was from being spanked by Samantha. Samantha said the bruise was from when the older daughter had previously fallen in the bathtub.

### (iii) Time in England and Parties'
### Separation in August 2015

While in England, Shaan volunteered at a hospital 1 day per month, teaching "a new dads class"; he received a letter of appreciation from the commander of that hospital. Shaan said he was actively involved in raising Lily when the parties were together. Shaan testified that Samantha would stay up until 3 or 4 a.m. "watching shows downstairs or on her iPad and then she wouldn't wake up the next day until . . . maybe about noon." According to Shaan, Samantha would then sit with Lily in bed and watch shows and go back to sleep. When asked how he would know this since he was at work, Shaan stated that since Samantha went to sleep so late, he would ask Samantha what time she woke up. Samantha would tell him that "she woke up and just gave the kids Pop-Tarts and went back to sleep on the couch and just turned on a kids' movie so she could go back to sleep." Shaan also claimed Samantha drank excessively when she was in England. She would drink and not "know that point where she needed to stop . . . there was a lot of points I was cleaning vomit off of the sofa or she would be passed out in the bathroom."

Shaan testified that prior to when Samantha left England, there were times when Samantha's son or Shaan's son would be at home, along with Lily, and Samantha would go on walks. When Shaan would suggest she take any of the children with her, they would get into an argument and she would tell him she just wanted to be alone. Samantha would tell him that "she doesn't have to say where she's going and she would just take off and go." Shaan believed she "was meeting with people" during these times. Also, Samantha would say she was going out for a few drinks with "other guys" and would not return until 4 a.m. or so, "with excuses that they were waiting on trains or missed trains." According to Shaan, "She was always very standoffish and angry that I was asking her questions."

With regard to the parties' separation in August 2015, Samantha said she left England at that time and moved back to Omaha because she was "sick of the instability." She claimed "there were times where we'd literally run out of money and couldn't go to the grocery store or get Lily diapers. I just couldn't deal with it anymore." She explained that being in a foreign country, she could not work, "couldn't do anything," and "[w]e couldn't provide the daycare." Also, "money was getting spent on things that I didn't know where it was going," and "I was just getting sick of running into the same issues."

However, Shaan shed a different light on the cause of Samantha's departure from England. Shaan disagreed that they had insufficient funds to buy things like diapers; rather, he testified there were other issues that arose which resulted in her leaving England. Shortly before she left, Shaan had found messages on Samantha's telephone which suggested she was soliciting sex to make money. When Shaan confronted Samantha about it, she "broke down crying," and "[f]ace to face she admitted that she did do it twice in England." Evidence was received purporting to be photographs of text messages contained on Samantha's cell phone which suggested she was doing this. According to Shaan, "She said she made an account online to meet gentlemen to do this, and she admits doing it two times. She felt that she needed to make some money somehow, someway. I didn't understand why she felt that way because we were never in a financially bad situation." Shaan testified this was the primary cause of the breakup of their marriage and why Samantha returned to Nebraska.

### (iv) Interference With Shaan's Parenting Time

Samantha's primary argument for custody of Lily was that she had been Lily's caregiver for the past 2 years and Shaan had not participated in things like "[d]octors, school, [and] daycare." She claimed that since she moved back to Nebraska

in August 2015, Shaan had only seen Lily one time in March 2017 and then shortly before trial. She acknowledged that Shaan had asked for parenting time, but she denied his requests because she did not "feel comfortable taking Lily overseas and leaving her there." Plus, she "can't afford to take that time off of work to fly her back and forth." And when Shaan has been "here" and asked for weekend visits or weeklong visits, Samantha also denied him parenting time because "[t]he only relationship they have is over a telephone . . . and . . . I was always the one taking care of her." Shaan testified that prior to when Samantha filed for divorce, he asked if he could come and get Lily and bring her back with him, but she would refuse, saying she was breastfeeding or giving some other excuse that "she couldn't come and drop Lily off or have me pick her up or she couldn't leave Lily." Shaan said he never asked for Lily to travel alone. Rather, he offered to come and pick Lily up and take her back with him.

Samantha acknowledged that Lily was supposed to have regular telephone contact or FaceTime with Shaan three times per week at 7 p.m., "but there's been times where we haven't been able to do all three." She explained that sometimes it was her work schedule or that "sometimes I just lose track of the days that I'm working late and I forget to tell him until right before," or she claimed that sometimes Shaan would forget.

When Shaan attempted to have parenting time with Lily in Virginia in June 2016, Samantha agreed and then canceled at the last minute. Samantha testified that she had agreed to bring Lily to Virginia and that she asked Shaan "for the money to get us down there." Shaan testified that he was going to be in Virginia to pick up his son and return to England and that Shaan's mother, his brother, and his brother's children were going to be there. Shaan wanted Lily to be there "so she could see more of my family." Shaan said that Samantha asked for $1,000 to drive there; he gave her $500 and told her he would give her the other half after they arrived. Samantha acknowledged that Shaan had volunteered to pay for airplane tickets for

Samantha and Lily to fly to Virginia, but Samantha declined "because it's easier for me to drive with Lily than fly. She hates being in planes." Samantha claimed, however, that at the "last minute," she could not go "because of work." She said that two or three employees quit at the gym she worked at in Lincoln the day before she was scheduled to leave and that she could not get anyone to cover their shifts. Shaan believed Samantha had no intention of coming to Virginia because just 3 days after she was supposed to meet him in Virginia, Samantha signed the divorce complaint instead.

Further parenting interference occurred in March 2017. On March 8, a hearing took place in order for Shaan to secure parenting time with Lily. The court ordered what that parenting time would be, but Samantha immediately failed to comply, altering the time and place for Shaan's parenting time. Appearing before the judge 2 days later on March 10, as discussed earlier, she gave the excuse that she had to go to the military base because "ID's" had expired, plus she had "some female issues." The court cautioned her that it expected compliance with its orders and that it would "look and see how the parties act during this period of time" when making a decision "as to what's in the best interest of the child long term." It was confirmed at the March 10 hearing that Shaan was to be picking up and dropping off Lily at Samantha's parents' home. Shaan testified that despite these very clear directives and the warning from the court, Samantha "would still change the locations of where I would pick [Lily] up, drop her off. It was never at a house. It was always at different establishments, a Walmart, a gas station, or a nail salon." Further, Samantha would not give him more than 5 minutes' notice before the scheduled meeting time, so Shaan had no idea where he was supposed to be. He said, "So usually I would be late because I wouldn't have any idea where I was going to be picking her up or dropping her off."

Then, in advance of the July 18, 2017, trial, Shaan sent Samantha several text messages informing her of his arrival in

Omaha on July 10 (although he testified to flying into Omaha the "Sunday before last," which was July 9) and requesting time with Lily. Shaan's schedule and request for parenting time was also communicated by his attorney to Samantha's attorney. Shaan tried every day to get time with Lily, but he was denied. Shaan testified:

> [Samantha] said Lily was in school and had a routine. I would ask if I could have her for the week or overnights and she would say no, or if I could have her for the day, she would say no, if I could pick her up from daycare, she would say no.

Samantha finally agreed to 4 hours of visitation with Lily on the Sunday preceding trial. Shaan testified:

> I originally asked if I could take [Lily] to the lake with my friends I've known for about 10 to 14 years with their children and she said no. She said that she had every right to dictate what I can and can't do with Lily. And then . . . basically, it was just a negotiation, and it was a long process where I said, well, can I have her from 9:00 to 4:00? And she said no. And then she said noon to 4:00. And we just kind of went back and forth until we agreed on the time and a place where she agreed that we could go.

Shaan said that Samantha's reason for not letting him have Lily as requested on that Sunday was because "[t]hey had family plans."

Samantha acknowledged that although Shaan and his son had arrived in Omaha on July 9 or 10, 2017, she did not allow Shaan to have parenting time with Lily until she gave him 4 hours on the Sunday (July 16) preceding trial (July 18). Samantha claimed that every time Shaan asked to see Lily, "it's already after I've dropped her off at daycare." Shaan would ask to pick Lily up at daycare, but Samantha said, "He's not allowed to do that." Samantha claimed that since the current court order says she has sole custody of Lily, the daycare is "not to release [Lily] to Shaan unless it changes." She

acknowledged she could have called the daycare and released Lily to Shaan, but she chose not to do so because she wanted to maintain Lily's routine and she did not want to disrupt Lily's education to see Shaan. She also testified that Shaan asked for overnights, "but he knows that I'm not comfortable with overnights."

Shaan testified about his concerns that Samantha would be unreasonable in the future if she were awarded custody. He noted the circumstances precipitating the need for a second hearing in March 2017. Even though the court had ordered certain parenting time,

> [w]e had to come back a second day for a hearing because she couldn't follow the orders, the very next day, and still after that I couldn't see [Lily] or pick her up, drop her off at the correct places. And I've already been here for over a week and only seen Lily for a day for a few hours, I don't think it will change anything in the future with her.

### (v) Communication Issues

From the March 2017 hearing until trial, Shaan said Samantha would never give him her address; she would tell him that he "should have paid attention in court or [he] should ask [his] lawyer." The only address Shaan had for Samantha was her parents' house; he did not know Samantha's boyfriend's address or that he had moved and was at a different address. During Shaan's FaceTime with Lily, which was scheduled for three times per week at about 7 p.m., Shaan said Lily was never at Samantha's house. "They were either at [the boyfriend's] house . . . eating dinner, or in a car. Never once was she at her parents' house." Shaan said it was difficult to know what was going on with Samantha and Lily because any question he would ask Samantha would be met with "attitude" and with her accusing him of not caring.

An example of Samantha's unwillingness to communicate occurred when Shaan tried to get records from "Lily's ER

visit." According to Shaan, Samantha told him that he could call and "figure out where she went" and that he could "call the hospitals and get the records [him]self." Samantha would not even tell Shaan which hospital or doctors; according to Shaan, Samantha would not give him any of that information "[b]ecause I can do it myself." Shaan also testified that "about a year ago," Samantha "totalled her vehicle when Lily was in the car and she never told [him] about it." When Shaan confronted Samantha about it later, she told him "it was none of [his] business and [he] didn't need to know because Lily was fine." Additionally, Shaan said he asked Samantha repeatedly for pictures of Lily or has asked about Lily's routine. "She says no. I didn't even get a phone call or anything for Father's Day."

Shaan anticipated Samantha's behavior would be worse when there was no pending case. As a recent example, Shaan received a text message from Samantha the week of trial when he was trying to take Lily to the lake. According to Shaan, Samantha said that "she has a hundred percent custody and she can dictate what I can and can't do with Lily."

(d) No Abuse of Discretion

In this case, Samantha was awarded the temporary care, custody, and control of Lily pursuant to the temporary order entered on August 8, 2016. Samantha claims that the court's final decision awarding custody to Shaan "wholly failed to recognize that Samantha had been the primary caregiver for [Lily] for her entire life" and that Shaan "had not cared for [Lily] overnight since August 2015." Brief for appellant at 11. She contends that Shaan's relationship with Lily was limited to telephone calls and FaceTime and that "[t]hese are not [the] proper foundations upon which a grant of custody should be supported." *Id*. Samantha testified, however, that she did not worry about Shaan as a parent "except for a concern about him drinking, but I feel like he could do it." (There was no evidence to support that Shaan had a "drinking" problem.)

Samantha testified that she did not think Shaan "knows what it takes because he hasn't been around [Lily]. He doesn't know her habits and every little tiny thing like I do." However, Samantha also testified she had no reason to believe Shaan could not properly care for Lily.

Thus, Samantha's primary argument is that Shaan should not have been awarded custody due to his lack of parenting time with Lily since August 2015, when she and Lily returned to Nebraska. However, Samantha was the main reason Shaan had been unable to have parenting time with Lily during that period of time. A parent cannot take a child across an ocean away from the other parent, deny that parent's every request to have parenting time with the child, and then claim priority to custody because the other parent had not spent sufficient time with the child. The evidence fully supports the district court's finding that Samantha intentionally "thwarted" Shaan's efforts to have parenting time with Lily. Given Shaan's active duty status in the military, and his need to coordinate parenting time to include his son, it was critical for Samantha to cooperate as best possible to promote parenting time between Lily and Shaan. It is in Lily's best interests to maintain and develop relationships with both her parents. However, rather than putting Lily's best interests first and foremost, Samantha did the opposite. She intentionally left England with Lily knowing Shaan was obligated to stay given his job with the Air Force. And then when Shaan attempted to arrange times for him to bring Lily back to England with him, Samantha refused to allow it for the various reasons set forth earlier. Further, when Shaan was stateside and sought cooperation with Samantha to spend parenting time with Lily in Virginia with his extended family, Samantha turned down the airplane tickets Shaan was willing to buy for her and Lily, and instead asked for money to drive there. After receiving $500, Samantha canceled the trip the day before she and Lily were scheduled to leave for Virginia, claiming it was a work issue. Within days, she filed for divorce.

The same pattern of parenting time interference followed by excuses occurred again when Shaan was in Omaha in March 2017, and again at the time of trial in July. Even when parenting time was ordered by the district court in March, Samantha failed to comply. Again, there were excuses. And when Shaan sought parenting time while in Omaha for an extended period preceding trial, Samantha denied his requests, claiming she did not want to disrupt Lily's daycare schedule. She also testified that while Shaan asked for overnights, "he knows that I'm not comfortable with overnights." Shaan was in Omaha for a week before Samantha finally permitted 4 hours of parenting time, and Samantha dictated what Shaan could and could not do with Lily that day. According to Shaan, she told him "she has a hundred percent custody and she can dictate what I can and can't do with Lily." The evidence was clear that Samantha would not foster a healthy parent-child relationship between Shaan and Lily.

On the other hand, Shaan testified that if he was granted custody, he would "100 percent" ensure that Samantha received regular and frequent access to Lily through parenting time and FaceTime. Shaan also talked about a program called "Our Family Wizard," stating that it is

> used in other courts in different states where all communications would go through this website with both parties and it would also include the visitation calendars, school schedules, medical documents, 100 percent of everything with . . . all the child's information. That way either of us can look at that information. Also, if we have to go back to court another time, all communications, all documents, would be there for the attorneys and for the judge to look at.

Shaan said that the program is at no cost to the families wanting to use it and that he believed it "would be a great tool to help both of us coparent." The evidence demonstrated that Shaan knew it was important to promote Lily's ongoing relationship with her mother and to help Samantha coparent with him.

[7] While the promotion and facilitation of a relationship by one parent with the other parent is a factor that may be considered when awarding custody, it is not the only factor, nor is it a completely determinative factor. See *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007) (both parties tried to cut each other off from children and both parties had anger and resentment issues, but neither parent was unfit, and father promoted best interests of children). Also, "The fact that one parent might interfere with the other's relationship with the child is a factor the trial court may consider in granting custody, but it is not a determinative factor." *Kamal v. Imroz*, 277 Neb. 116, 122, 759 N.W.2d 914, 918 (2009).

While the facts of the present case suggest there should be circumstances in which a parent's interference with a child's relationship with the other parent is so substantial that it could by itself be a determinative factor, we are guided by the case law set forth above. Therefore, like the district court, we also consider other custody factors as applied to the evidence in this case, to determine whether the district court abused its discretion by awarding legal and physical custody of Lily solely to Shaan.

In addition to finding that Samantha "thwarted" Shaan's efforts to maintain contact with Lily and that Samantha was the "least likely" parent to encourage a relationship between Lily and Shaan, the district court also had concerns about Samantha's lack of time spent with her other children, her dishonesty, her failure to maintain a stable home and lifestyle, her failure to pay child support, and her poor decisions (noting specifically that it was inappropriate for Lily to be living in a home with Samantha's boyfriend while Samantha was still married to Shaan). The court also believed there were "morality issues associated with [Samantha's] conduct"; this could encompass a number of matters raised by the evidence, and it was certainly appropriate for the district court to consider matters of moral fitness. The evidence supports the court's findings as to these various factors.

Although Samantha takes issue with some of the court's findings, we reiterate the standard set forth earlier. In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

[8] The district court did not abuse its discretion by rejecting the parties' agreement on joint legal custody. A court must determine that joint custody (legal or physical) is in a minor child's best interests regardless of any parental agreement or consent. See Neb. Rev. Stat. § 42-364(3) (Reissue 2016). The district court rejected joint legal custody in this case because the "parties do not communicate" and Samantha "has done whatever she can to thwart any type of meaningful and appropriate contact" between Lily and Shaan. We agree with the district court that joint legal custody was not feasible given the evidence in this case. We also conclude the district court did not abuse its discretion by awarding Shaan the legal and physical custody of Lily.

## 2. Removal From Nebraska
### to Arizona

Samantha claims the district court abused its discretion by granting Shaan permission to remove Lily from Nebraska to live with him in Arizona. The July 26, 2017, decree states:

> [Shaan] has a legitimate reason to leave the State of Nebraska with [Lily]. He has been in the Air Force for fourteen years and has only six years remaining for retirement. Further, it is in the best interests of [Lily] that she resides with [Shaan] as he has appropriate motives, [she] will have a better quality of life, and it is in [her] best interests both emotionally and physically to reside permanently with him in Arizona.

[9] Samantha argues that the district court failed to consider and apply the factors set forth in *Farnsworth v. Farnsworth*,

257 Neb. 242, 597 N.W.2d 592 (1999). In *Farnsworth*, the Nebraska Supreme Court stated:

> To prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. . . . After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. . . . Of course, whether a proposed move is in the best interests of the child is the paramount consideration.

257 Neb. at 249, 597 N.W.2d at 598.

Therefore, we will first consider whether Shaan had a legitimate reason for his request to move Lily from Nebraska to Arizona. We will then consider whether the district court abused its discretion by concluding it was in Lily's best interests to allow the move to Arizona. The paramount consideration is whether the proposed move is in Lily's best interests. See *id*.

#### (a) Legitimate Reason
#### to Leave State

Samantha does not challenge the district court's finding that Shaan had a legitimate basis for seeking removal due to his career in the Air Force. There is no question that Shaan was asking to move Lily to Arizona because of his military orders and his current active duty assignment there. Shaan had tried to get orders to an Air Force base in Nebraska, but it was not an available option. The evidence supports that Shaan had a legitimate basis for seeking removal.

#### (b) Child's Best Interests

[10] In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the

noncustodial parent, when viewed in the light of reasonable visitation. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). See, also, *Farnsworth, supra*.

### (i) Each Parent's Motives

The first consideration is each parent's motives for seeking or opposing the move. Samantha claims that although the district court noted Shaan's career as the motive for seeking removal, the court did not address her motive for opposing removal. Samantha states, however, that because her "motive to oppose removal was only to maintain custody of [Lily], this prong neither weighs in support or against removal." Brief for appellant at 14. We agree this is not a particularly influential consideration; we nevertheless note that both parties had reasonable and good faith motives to support or oppose the move.

### (ii) Quality of Life

[11,12] For the second consideration, the Supreme Court has set forth a number of factors to assist trial courts in assessing whether the proposed move will enhance the quality of life for the child and the custodial parent. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Factors to be considered include: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Id.* This list should not be misconstrued as setting out

a hierarchy of factors. *Id*. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*.

Since considerable evidence pertinent to these best interests and quality of life factors has already been set forth in our discussion on custody, we will not separately discuss each factor and repeat that evidence here. However, we provide some additional evidence related to Shaan's living situation in Arizona to provide further context for the court's determination that Lily's moving to Arizona to live with Shaan would enhance her quality of life.

Shaan testified that he rented a 1,500-square-foot, three-bedroom home in Arizona, where Lily would have her own bedroom and bathroom. He said the military base in Arizona is a "training base and education base," so "there's no deployments or temporary assignments." Shaan would be there the entire time. Shaan has been in the Air Force for a little over 14 years, working the same job as a jet engine mechanic, and has about 6 years until retirement. Shaan testified that he talked with his "chain of command" and his "supervision" and that his schedule "would 100 percent rotate around [Lily] and her needs." Also, Shaan's current plan following retirement is to stay in Arizona. He said that there are "a lot of [job] openings at the airport" and that the military base also hires civilians back after retirement "into the shops and the flight lines on base" if they have proper degrees and certifications.

According to Shaan, Lily would go to preschool at a child development center on the military base, which center is about 15 minutes from Shaan's home. Shaan said it "won for 2016 the number one child development center in the Air Force." He testified that there are two teachers in each room with no more than 15 or 16 students and that one teacher would either have a teaching degree or be working on one. When Lily starts elementary school, there is a school "right around the corner" from Shaan's house, which he estimated was a 3- to 5-minute drive. Shaan met with the school's principal and teachers.

Shaan testified that Lily's daycare in Omaha had a high turn-over rate with its employees. However, Samantha testified that "the daycare that [Lily's] in now is probably better because it has cameras so we can watch her or check up on her through-out the day."

As for extended family, Shaan testified that his father was moving to Arizona from India at the end of July and that his mother would arrive later to "come live with me to help take care of Lily." His mother was living in Connecticut, but "[s]he's willing to uproot everything to help me and Lily out." In Omaha, Lily had been living with Samantha's extended family half the time, including Samantha's mother and Samantha's teenage brother (who was alleged to have engaged in inappropriate sexual contact with Samantha's older daughter). Lily had also been living half the time with Samantha's boyfriend at his apartment. Shaan testified that he was concerned about the possibility of "more physical violence" between Samantha and her boyfriend. He believed "that's just something that [Samantha] learned in her personal home life." Shaan explained that Samantha's mother "has been so mad that she's broken two televisions and put[] a bar through their back glass sliding door." From what Samantha had told him and what he had seen firsthand, Shaan said that "it's not a great relationship" between Samantha and her mother. Shaan added, "[T]hey're always yelling, always screaming." They might have "good times" for 15 or 20 minutes in a day, he said, "But the rest of it is just arguing amongst everybody in that household, her little brother, her mother, her father, and her grandmother."

At trial, Samantha testified she did not think it would be in Lily's best interests to move to Arizona because "I've been her primary caregiver for the last two years, she doesn't have family out there. She has family here." Samantha added, "I feel like if she goes to Arizona she doesn't have anybody except for, like, his military buddies, and . . . I think she'd be better staying here with her actual blood family."

On appeal, she reiterates that she has been Lily's primary caregiver and that "Samantha's family is the only family [Lily] has really ever known." Brief for appellant at 15. She claims that Lily has only had interaction with Shaan's family through FaceTime and that Lily does not have a relationship with Shaan's parents to the same degree she has with Samantha's family. However, as we already discussed, when Shaan arranged for Samantha and Lily to meet him in Virginia in June 2016 when some of his family would be present, Samantha canceled the trip. This obviously hindered Lily's ability to become more familiar with extended family on her paternal side. Further, Shaan testified that the last time his mother saw Lily was in England in 2014 and that there was "a big strain between my mother and Samantha." Shaan said that Samantha would stay in her room and would not talk to his mother: "[Samantha] would keep Lily locked in her room with her. She'd come downstairs and get food and go back upstairs." Therefore, with regard to extended family, it is true that Lily would be more familiar with Samantha's extended family in Omaha due to the circumstances we have described. However, given her young age, the lack of opportunity to become more familiar with extended family on her paternal side cannot be viewed as a factor weighing against removal, especially in light of her paternal grandparents' move to Arizona. Having less time with extended family on her maternal side, however, can be viewed as a factor weighing against removal.

Samantha argues that "more factors weighed against removal than for removal." Brief for appellant at 21. Samantha claims that Lily's emotional, physical, and developmental needs are best met by her, since she has been the primary caregiver, and that Shaan failed to prove the move to Arizona "would significantly improve" Lily's living conditions. Brief for appellant at 17 (emphasis omitted). Samantha further argues that Shaan failed to prove Lily's educational opportunities would be better in Arizona than in Nebraska. Samantha also contends that

she has "a much stronger" relationship with Lily and that her "hesitation in permitting Shaan to care for [Lily] overnight or through the weekend" should not be viewed as obstructing parenting time, but was "merely an effort by Samantha to keep [Lily] in the safest environment possible." *Id*. at 19-20. Samantha claims that her stronger relationship with Lily, plus Lily's relationships with extended family in Nebraska, weighed against removal. Further, Samantha argues that allowing Shaan to remove Lily to Arizona "will only make matters worse," because the "great distance the court put between [Lily] and her primary caregiver is only going to cause more hostility," and therefore the likelihood of increased hostilities between the parents weighs against removal. *Id*. at 21.

We are mindful that Samantha's role as the primary caregiver of Lily while residing in Nebraska is of consequence and that Lily's ties to Samantha, the community, and other family members weigh against removal. However, as described above, there were also factors favoring removal. And regardless of the number of factors weighing one way or the other, it bears repeating that the quality of life factors should not be misconstrued as setting out a hierarchy of factors. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*. Thus, the weight of one or two highly significant factors in a particular case may outweigh multiple other factors of less significance, depending on the facts of the case. Further, the list of criteria is not meant to be exhaustive, nor will every factor be present in each case. See *id*. However, these considerations and factors serve as appropriate guideposts to trial courts in determining what is in the child's best interests. *Id*.

In our de novo review of the evidence related to the quality of life factors, the evidence supports the district court's finding that Lily would "have a better quality of life" if she lived with Shaan in Arizona.

### (iii) Impact on Noncustodial
### Parent's Visitation

[13] Consideration of the impact of removal of children to another jurisdiction on the noncustodial parent's visitation "focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship." *Farnsworth*, 257 Neb. at 251, 597 N.W.2d at 599. And "[w]hen looking at this consideration, courts typically view it in the light of the potential to establish and maintain a reasonable visitation schedule." *Id*.

The district court adopted the mediated parenting plan with a few revisions, including the provision that Samantha receive up to 6 weeks of parenting time with Lily each summer. Samantha was also allowed to "Skype" with Lily three times per week at "reasonable hours," and various holidays and school breaks were to be alternated between the parties. Samantha was responsible for arranging transportation for her parenting time; however, Shaan was ordered to reimburse one-half of Lily's cost for two trips to Omaha and back to Arizona for Samantha's parenting time. Shaan testified that at the time of trial, a "last minute one-way flight" between Phoenix and Omaha was $130. Samantha argues that given her limited resources, "this effectively eliminates [her] ability to see [Lily]." Brief for appellant at 22. She contends, therefore, that this would reduce her "visitation with [Lily] to FaceTime." *Id*. She acknowledges this was the same situation Shaan had previously, but now that Shaan was living in the United States, "the court had the opportunity to craft a means of custody and visitation that would greatly benefit both parents." *Id*. She suggests that if the court had refused removal (and presumably granted her custody), the "impact on visitation between [Lily] and Shaan still would have improved." *Id*. at 22-23. She claims that since Shaan now lives closer, he could fly to Omaha "whenever a seat is open on an Air Force plane." *Id*. at 23. She admits that it would have still been difficult for Shaan to have parenting time

with Lily from Arizona, but argues "it would have been much easier when compared to the burden that has been placed on Samantha." *Id*.

There is no question that any time substantial distance exists between the parents' residences, there will be a greater burden placed on the noncustodial parent when exercising parenting time, including the increased cost of transportation. In order to address such costs in this case, the district court gave Samantha a slight break on child support by using an hourly rate of $9 per hour for Samantha's income instead of the $12 per hour she would be earning at her new job. Additionally, as noted, the court ordered Shaan to pay certain transportation costs as well. Although certainly not ideal, the parenting plan provides Samantha with reasonable parenting time. The distance and costs will be a burden, but not a barrier, to Samantha's ability to maintain her relationship with Lily.

### (c) Summary

The district court did not abuse its discretion in finding that Shaan had a legitimate basis for seeking removal of Lily from Nebraska to Arizona due to his military orders that assigned him there. Further, in reviewing the best interests considerations set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), as applied to the evidence in this case, we cannot say that the district court abused its discretion by granting Shaan's request to remove Lily from Nebraska to Arizona.

### 3. Child Support

Samantha assigns as error that the district court abused its discretion by ordering her to pay child support. She acknowledges that a "custodial parent is entitled to child support." Brief for appellant at 23. She argues only that "[i]t was an abuse of discretion for the court to order [her to] pay child support to Shaan, because the court abused its discretion in

granting sole physical custody to Shaan, and permitting Shaan to remove [Lily] from the jurisdiction." *Id*. She makes no argument related to the income or deductions used in calculating child support; rather, she argues only that she should not have been ordered to pay child support because, essentially, she should have been awarded custody. We have already found no abuse of discretion by the district court in awarding Shaan custody of Lily; therefore, we need not address this assigned error further.

## VI. CONCLUSION

For the reasons set forth above, we affirm the district court's July 26, 2017, decree of dissolution.

Affirmed.