IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

ERIN T. V. KIP T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ERIN T., APPELLANT,

V.

KIP T., APPELLEE.

Filed March 10, 2020.    No. A-19-491.

Appeal from the District Court for Otoe County: JULIE D. SMITH, Judge. Affirmed in part, and in part remanded with directions.

Michael Ziskey, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., for appellant.

Matthew Stuart Higgins, of Higgins Law, for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

In this dissolution action, the Otoe County District Court awarded Erin T. and Kip T. joint legal custody of three of their children, with Kip being awarded physical custody of those children subject to Erin's reasonable rights of parenting time; Erin was awarded legal and physical custody of a fourth child. Erin was ordered to pay child support. She appeals, challenging the district court's decision to award physical custody of three of the children to Kip, the amount of parenting time awarded to her, the court's calculation of child support, and the court's division of the marital estate. We affirm the decree, but remand with directions to modify Erin's child support obligation consistent with this opinion.

- 1 -

## II. PROCEDURAL BACKGROUND

Erin and Kip were married in 2008, and they have four children: Skylar T. (born 2001), Madisen T. (born 2002), Saralynn T. (born 2005), and Larry T. (born 2009). Erin's previous husband is the biological father of the three older children, but they were all adopted by Kip in 2010.

Erin (35 years old at the time) filed for divorce in August 2017, and asked for temporary and permanent legal and physical custody of the children. Kip (43 years old at the time) responded, also seeking temporary and permanent legal and physical custody of the children. Both parties were residing at the same address in Palmyra, Nebraska, which was Kip's premarital property.

Both parties filed motions for temporary relief. The district court entered a temporary order on November 8, 2017, awarding Erin legal and physical custody of all four children. The temporary order awarded Kip parenting time every other weekend from Friday at 6 p.m. until Sunday at 6 p.m. Kip was ordered to pay child support in the amount of $1,686 per month commencing November 1. Additionally, the court noted Erin's intention to move to Ashland, Nebraska, but the court ordered that the children remain enrolled in the Palmyra school district for the remainder of the school year. Both parties filed motions to reconsider the temporary order: Erin requested the court reconsider its ruling requiring the children to remain in the Palmyra school district for the remainder of the school year, requiring her to transport the children to and from Kip's home, and requiring all four children to attend parenting time with Kip; Kip asked the court to reconsider the temporary child support entered, alleging the calculation overstated his income. Kip also filed a motion for an order to show cause, alleging that Erin was in contempt for enrolling the children in Ashland Public Schools, and he filed a motion to establish holiday parenting time and telephone calls. In its modified temporary orders filed on November 21 and December 1, the court: set forth a parenting time schedule for Thanksgiving and Christmas; awarded Kip the right to electronically communicate with his children for up to 30 minutes each day; ordered parenting time exchanges to occur at the Casey's store in Palmyra; stated that Skylar, Madisen, and Saralynn "shall be encouraged to attend all visitation with [Kip], but shall not be required to attend such visitation" except that "all minor children shall attend the holiday visitation . . . regardless of their stated preferences, unless [Kip] declines to exercise some portion of that visitation"; removed that portion of the temporary order requiring the children to remain enrolled in the Palmyra school district and stated that Erin "may continue with the children enrolled in the Ashland Public Schools"; and modified Kip's temporary child support obligation to $1,416 per month commencing November 1.

Trial took place on January 31 and March 1, 2019. We will discuss the trial evidence in our analysis where it is relevant to the errors assigned. However, we will note that at the time of trial, Kip was no longer asking for custody of or parenting time with Skylar. A decree dissolving the marriage was entered by the district court on April 27. Erin's motion for new trial was denied.

Relevant to this appeal, the district court awarded Erin sole legal and physical custody of Skylar (17 years old at the time). The court awarded the parties joint legal custody of Madisen (16 years old), Saralynn (13 years old), and Larry (9 years old), but to the extent there was any disagreement about the children's religious upbringing, Erin was to have final authority. Kip was

awarded sole physical custody of Madisen, Saralynn, and Larry, subject to Erin's reasonable rights of parenting time. The court developed a parenting plan which was attached to and incorporated in the decree. Pursuant to the parenting plan, Erin was to have parenting time with Madisen, Saralynn, and Larry every other weekend from Friday at 5 p.m. until Sunday at 8 p.m. during the school year, and alternating weeks during the summer; a holiday parenting time schedule was also established. Kip was not to have any parenting time with Skylar unless agreed upon by the parties or Skylar.

The district court ordered Erin to pay Kip child support in the amount of $278 per month when there are four children (based on split custody), $745 per month when there are three children, $666 per month when there are two children, and then $506 per month when there is one child. Kip was ordered to provide health insurance for the dependent minor children. The court valued and distributed the parties' assets and debts, and it specifically stated that no cash equalization payment was awarded in this case.

Erin appeals.

## III. ASSIGNMENTS OF ERROR

Erin assigns, summarized and reordered, that the district court abused its discretion by (1) awarding sole physical custody of Madisen, Saralynn, and Larry to Kip; (2) not awarding her reasonable parenting time; (3) miscalculating Kip's retirement and health insurance deductions in its child support calculation; and (4) not making an equitable division of the marital estate.

## IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald, supra.*

## V. ANALYSIS

### 1. CUSTODY AND PARENTING TIME

Erin argues the district court abused its discretion when it awarded physical custody of Madisen, Saralynn, and Larry to Kip. She also argues the court did not award her reasonable

parenting time. Kip contends that the court's finding that Erin engaged in "parental alienation tactics" and did not encourage or require the girls to attend parenting time with Kip "is well supported by the evidence." Brief for appellee at 26. We agree with Kip, and set forth relevant portions of the evidence below.

(a) Evidence at Trial

Erin testified that Kip used to be good to the older children until they had Larry, but when Larry got "old enough," "things really started changing." Kip played favorites with Larry, and treated him differently than the other children. (In response, Kip testified that when Larry was born, Erin said, "'I got my three. This one's yours.'") According to Erin, Kip was not really involved in parenting the children when they lived together. She "did all of the doctors' appointments, dentist appointments, getting Sky's meds, [and] taking him to the psych appointments." She was also the one who had to discipline the three older children. Kip testified that he was the one who cared for Larry and took him to doctor's appointments. As for the other three children, he attended all the doctor and dentist appointments he could when he was not working, and he attended school functions.

Erin testified that Skylar and Madisen have Asperger's syndrome, "which is under the . . . autism spectrum disorder." Erin stated that Skylar and Kip "like to fight a lot." Skylar "can't really communicate effective [sic] why he's angry," "used to have angry outbursts when Kip would call him a moron or tell him he should have never adopted him"; "all [Skylar] wanted was a dad that actually cared about him, not made fun of him." When the girls got older, "things started changing" with them too. Erin said she would wake to yelling and screaming between Kip and Madisen, and fighting between Skylar and Kip. She said that when Saralynn got to "be double digits," Kip "started in on her." According to Erin, Kip would use vulgarities and swear often in front of the children, "would call them F tard, all kinds of names," and he used to call Madisen a slut, would make fun of her hair, and tell her she was fat. Kip denied ever calling Madisen a slut; he was not asked about the remainder of Erin's testimony above.

Erin's brother testified that Kip used to "treat the kids pretty good" and would show up to family functions and made an attempt to get to know Erin's family. However, when Larry was about 1 year old, thing started to change; Kip stopped coming to family functions. Around that time, Erin's brother had concerns about Kip's behavior around the children and "Erin being noticeably distressed about what's going on in the house." He recalled that when Skylar was 11 or 12, Kip called Skylar a "F'ing moron, F'ing retard." And after Erin and Kip separated, Erin's brother overheard a speakerphone call between Kip and Skylar wherein Skylar was telling Kip about a doctor's visit and his thyroid symptoms and Kip's response was "something along the lines of," "'Good. I'm glad you're experiencing it. Why don't you go kill yourself.'" (During his testimony, Kip denied ever saying anything like that on the phone or in person.) Erin's brother testified that Erin is a "very involved" parent and he had "never heard her call them a name." He said the children have "disabilities, learning disabilities I guess, but [Erin] doesn't let them use that as an excuse. She makes them try harder and pushes them."

According to Kip, he did not have trouble with the children before the divorce proceedings. And he specifically stated that he and Skylar "always got along fine until all of this divorce stuff

started." He said when Skylar would get in trouble at school he would call Kip and Kip would talk him through it. Kip denied that he ever got into a physical confrontation with Skylar. Kip was then asked if he ever witnessed Skylar and Erin engage in a physical confrontation. Kip stated that in 2012 or 2013, Skylar was "cussing, hollering," and Erin was trying to get him to listen; Skylar then kicked Erin in the knee and she was on crutches for a week or two. Kip also testified that in October 2017, he saw Skylar "shove" Larry to the floor; as punishment, Kip took Skylar's phone, and Skylar reacted by screaming, hollering, cussing, and punching things. When Kip was home, he would not leave Skylar alone with Larry because he did not want Larry to get hurt. Kip also acknowledged seeing Skylar direct violent and physically aggressive behavior towards Madisen and Saralynn, and on one occasion saw Skylar hold a knife to Madisen's chest and threaten her. (Erin testified the knife incident was "due to" some medication Skylar was on at the time.) Kip offered a video recording that was received into evidence (exhibit 130, file name "#2…11-2-2017") that showed Skylar yelling and screaming profanities at Kip and calling him names while wielding a crutch and threatening to assault Kip, and at one point Skylar actually hit Kip with the crutch; Madisen and Saralynn were in the room at the time and one of them can be heard saying that Skylar was "beating the wall with the crutch" (he was out of the video frame at the time) and Saralynn can be seen on her cell phone and heard saying "Mom, I'm scared." (This incident occurred after the divorce proceedings were initiated, but according to Kip, the incident took place before Erin and the children moved out of the home.) Kip testified that was the only time Skylar ever hit him, but that Skylar had "put holes in walls and stuff before."

After Erin was granted temporary custody of the children (order filed on November 8, 2017), despite that order saying the children should remain enrolled in the Palmyra school district for the remainder of the school year, she and the children nevertheless moved to Ashland where Erin's family lived, and she enrolled the children in school there. Erin testified that she moved because she "didn't have the actual paper [temporary order] that said we had to stay here." Erin claimed she moved because of issues between Kip and Skylar, there was no place to rent in Palmyra, and she "wasn't going to buy a house." She subsequently received permission from the district court to enroll the children in school and stay in Ashland. At the time of trial, Erin was renting a five bedroom, one bath house in Ashland. Erin testified that in the 15 months since she and the children moved out of the marital residence, the children have adjusted. She said that Skylar and Larry were getting along and liked to do community service together. All four children attended youth group at church. (The children's youth pastor confirmed that all four children attended youth ministry programs during the week and church services on Sundays for "[a]t least a year." The pastor testified that Skylar is kind, and "if you have a problem with Skylar, it's a you problem, because he is kind to every single person he's ever met"; "he is one of the few kids that has the ability to be friends with everybody.") According to Erin, Skylar made honor roll and was talking about going to college. Madisen and Saralynn were struggling in school, but both "try really hard." And Erin said that Larry was "doing pretty good" in school.

Erin acknowledged that for the past 15 months, parenting time exchanges occurred at the Casey's in Palmyra. Per the current temporary order, the older three children could decide if they wanted to attend parenting time with Kip. According to Erin, she encouraged the older children to go with Kip, and "[a] lot of the times they'll be in the car when we're at Casey's," "[t]hey just

don't get out" and "I can't make them get from my car to his car." She agreed that for the last 15 months, Kip was mainly having parenting time with only Larry. When asked if she knew how many weekends the other children had gone with Kip, Erin responded, "The girls were going for a little bit, but then hiccups happened over there and things happened where they didn't want to go again," and "[t]hen it went back to the whole, 'I'm not going.'" Erin denied that she did anything to discourage the children from going with Kip during his parenting time. On cross-examination, Erin stated that the last time Skylar visited Kip was Thanksgiving 2017; she said Skylar and Kip got into a fight that day and were "yelling and fighting on the phone and we [Skylar and Erin] were sitting outside of [Kip's] driveway." Erin could not remember the last time Madisen was at Kip's house. And Erin stated that the last time Saralynn went to a visit with Kip was around September 2018; Erin acknowledged that prior to that there had been a long stretch where Saralynn had not seen Kip. Kip testified that since the modified temporary order was entered, he only had parenting time with Skylar one time, and Madisen and Saralynn three times; this was despite continuously requesting parenting time. He said that Erin would bring "[n]ormally just one" child to the parenting time exchange location.

The main communication method between Erin and Kip was text messaging. Erin believed that a lot of Kip's text messages were accusatory, and that he often asked questions he already knew the answer to. Erin stated that "if [Kip] starts harassing me -- a lot of the times I do not respond to him for a while." But Erin felt that she had been as communicative as she could be. Kip was questioned about a packet of text communications between him and Erin from the second half of 2018. Although those text messages were not offered or received into evidence, Kip testified about various exchanges. On one occasion, he asked to speak with Madisen, but Erin responded, "'She talked to you already.'" He said that also happened other times when he asked to speak to Larry. Additionally, on another occasion Kip inquired about an incident that took place at Erin's home for which a police report was taken, but Erin responded, "Not your business." Kip stated Erin never told him about a counseling appointment for Larry, and that her response was she thought Larry told him. When Kip challenged her about that, he said Erin's response was that it was up to Larry to tell Kip. Kip also stated that Erin would not respond to inquiries about Madisen's therapy appointments.

Erin testified that Skylar was on juvenile court probation starting in May 2018 after he broke a window in Erin's rental home (he was upset and angry at the time); she had to report it because the landlord told her it was destruction of property. Erin stated that Skylar no longer had to report to probation meetings, and she "got word that we're going to have another hearing set to get him off probation because he's doing good."

Erin also testified about an incident involving Madisen and a "guy that she had met when we lived in Palmyra." Erin stated that in the summer of 2018, she allowed Madisen (15 at the time) and the young man (18 at the time) to go on dates with adult supervision. On cross-examination, Kip's counsel asked Erin if she saw any problem with a 15-year-old girl hanging out with an 18-year-old man. Erin responded, "Yes, I did, and I didn't like it, but the way Madi works is you tell her no, she's going to go right to it." Erin stated that Madisen went on three dates with the young man, one to Burger King, one to the movies, and one to the mall. Kip testified that he thought it was "ridiculous" that Erin allowed Madisen to date an older man. He said, "It ain't so

much as age. It's what he does. I mean, his age ain't right because he's an adult. But my concern was getting pregnant, he's a druggy, he's in trouble all of the time." When asked if he ever voiced an objection about the young man, Kip responded, "Yes, [to] [Erin] and Madisen both." He said Erin told him, "'It's not your house, so it's not your problem.'"

According to Erin, in August 2018, a month after Madisen and the young man's relationship ended, Madisen left a note stating that she was going to a mall in Omaha, Nebraska, with a female she had worked with. (On cross-examination Erin stated that Madisen's former coworker told Erin she was 16 years old, but that she was actually 22). Erin stated that, unbeknownst to Madisen, the young man was also in the car, and the three of them ended up going to Lincoln, Nebraska. Erin reported Madisen as missing to the police. Madisen was missing for 2 to 3 days, and when she was found, she reported that she had been sexually assaulted by the young man. Erin filed protection orders against the young man on Madisen's behalf. When Erin found out that he subsequently contacted Madisen through "Google Hangouts," Erin called the police. It was Erin's understanding that the young man was being prosecuted. Erin stated that she kept Kip informed of the whole situation. However, Kip testified that he first learned of Madisen's disappearance from Erin's ex-husband, who is Madisen's biological father.

Erin testified that in October 2018, she saw a text message from Kip on Madisen's phone (after the sexual assault and protection order) wherein Kip said that if Madisen would help him with the custody situation, then her adult boyfriend could live at Kip's house. Erin stated that she did not confront Kip about the text message. On cross-examination, when asked if she had those texts, Erin responded, "No." She stated that Madisen's phone had been seized by law enforcement and was in the crime lab. It was pointed out during Kip's testimony that Kip produced his text messages with Madisen during discovery. When Madisen asked if her boyfriend could come live with Kip, his response was, "No, I don't think so. [He] will not be moving in with us."

Erin testified that she used to receive rental income from Matthew Taylor, when he rented an apartment above her garage. She was no longer receiving that rental income because the two of them were in a relationship and living together. Erin knew "vaguely" that Matthew had been convicted of crimes and incarcerated (and "[v]aguely" "heard through word of mouth" that some of the convictions were for crimes of violence), but she did not have an in-depth talk with him about it because "he's already served his time." When asked if it would concern her if she found out that Matthew was convicted of crimes of violence, Erin responded, "It would be a little concerning if circumstances were a little different. He's not like that now. And he served a lot of years in prison for a lot of stuff, that was bad, but he hasn't been like that since he got out." Erin testified that Matthew was released from incarceration 2 years ago and "has two more times of parole contact and he's off." As far as Erin knew, none of Matthew's charges had to do with children. (The charges for which Matthew was convicted and incarcerated do not appear in our record.) Matthew is the half brother of Erin's ex-husband.

According to the record, Erin's ex-husband (and the biological father of her older three children) allegedly sexually abused Madisen when she was younger. There was testimony and other evidence that in May 2018 Erin took Madisen to an annual cookout at her ex-husband's mother's house. Erin's testimony regarding this event was contradictory. She initially stated that her ex-husband, who lived out of state, "showed up" at the cookout. She claimed she and Madisen

left "immediately," but admitted that her ex-husband talked to them on their way out. But later, when confronted with Madisen's report to a therapist that Erin asked her if she would like to visit her biological father at a cookout, Erin eventually acknowledged that was true. Then when confronted by Madisen's report to a counselor that Erin did not attend the cookout, Erin stated, "I was right there." When Kip's counsel asked Erin why she thought Madisen lied to the therapist, Erin responded, "[Madisen] probably didn't tell the therapist that I was next door at her uncle's house."

Erin acknowledged that Summer 2018 was "very overwhelming" because she was working multiple part-time jobs and was enrolled in a master's program.

Erin testified that she started the children in counseling in May 2018, after the school counselor recommended "outsource counseling" to deal with the effects of the divorce; Larry was having issues minding personal boundaries and the girls were "crying on a drop of a hat and just upset." Madisen and Skylar had been going to counseling weekly since May. Saralynn and Larry were going weekly, but Saralynn got released, and Larry "wasn't ready" so the counselor thought it was best to take a break and wait until he was a little bit older. According to Erin, she was not involved in the children's counseling sessions. She informed Kip of when the counseling sessions were "multiple times." When asked if Kip regularly attended the sessions, Erin responded, "Madisen's, yes. Skylar's, no. The minute that Larry stopped, he no longer went. And Madisen's was kind of like a hit or miss." However, Kip's testimony was that after Larry stopped going to counseling he continued to attend Madisen and Skylar's appointments when he knew about them.

The children's counseling records were received into evidence. Although we have reviewed the records, we will not go into great detail about the content of those records. We do note that in an assessment interview in May 2018, Erin reported to Skylar's counselor that it was common for Skylar to have conflicts with Kip and to fight with his siblings. And both Skylar and Erin reported that Skylar was mistreated by Kip, including "physical and emotional abuse." Erin admitted that the entire family yells a lot and the siblings are often verbally and physically aggressive with each other. Skylar admitted to using a lot of swear words when he got angry and would hit property and others when he was extremely angry. At her assessment interview in May, Madisen reported alleged "emotional abuse" by Kip; Erin was present at that interview. At one session in October, "Erin reported that she feels 'hurt' that Madisen has been communicating with Kip and stating negative things about her." A report from a session in January 2019 stated that Madisen "expressed frustration in regaards [sic] to possibly having spend [sic] time at Kip's home as custody is being arranged," "[s]he stated that she 'doesn't like it there.'" A report from February stated, "Madisen's mother has been actively involved with her treatment." At Saralynn's assessment interview in May 2018, at which Erin was present, Erin reported concerns "about how Saralynn was treated by [Kip] in the past and that she may have experienced some trauma from some events involving [Kip]." During that interview, Saralynn "reported being unhappy with how Kip treated her siblings and her but reported her interactions with Kip were generally positive but added she has never felt very close or even loved by [him]." Erin reported Saralynn "may have witnessed some domestic abuse between Erin and Kip," and though "Kip never physically assaulted" Erin, "there was a lot of yelling." Erin also reported Saralynn was "emotionally abused" by Kip "not treating her as his own child"; Saralynn denied any history of emotional abuse but

reported she did not feel loved or cared about by Kip. At a session in June, at which Erin was listed as present, Saralynn "said she found out some disturbing info from her mom through court about [Kip]"; Saralynn also "said her biggest problem with Kip is how he treated her older siblings by calling them 'stupid' and 'idiot' . . . [she] reported she felt Kip implied she was fat or would become fat." At a subsequent session in June, Saralynn reported that she had a "pleasant" conversation with Kip the day before. A case management contact was noted in June and stated that the counselor talked to Kip on the phone and he "talked about how Erin is always lying and is telling what the kids [sic] to say in therapy"; the counselor "encouraged him to call if he needed information and said he could sit in for part of a session on his own if it was alright with Sara." At one of his October sessions, Larry stated, "'I'm more my dad's blood. I say it how it is' and 'I'm like my dad and blow up when I am upset.'"

Erin had concerns about Kip's alcohol use. She testified that he drinks "at least two, three beers" every night, and that he would drive with the children in the car after he had been drinking.

Erin was seeking legal and physical custody of all four children because "they're doing really good where they're at and all four of them are doing amazing," "[t]here's less chaos," and "[n]obody gets picked over the other one," "they're all created equal." The children have friends and family in Ashland, are active in the community, and are well-adjusted. Erin did not believe that Skylar should be separated from the other children. When asked what kind of parenting time she would suggest for Kip if she was granted custody, Erin stated "[s]imilar to the temporary one" because "they like routines." In Erin's proposed parenting plan (exhibit 31), Kip would have parenting time every other weekend from Friday at 6 p.m. until Sunday at 6 p.m., and extended parenting time in the summer (6 weeks, exercised in blocks of up to 14 days at a time); her plan also established a holiday parenting time schedule.

Kip agreed that Erin should have sole legal and physical custody of Skylar, with no parenting time for Kip. However, Kip was seeking sole legal and physical custody of Madisen, Saralynn, and Larry. In Kip's proposed parenting plan (exhibit 133), Erin would have parenting time with Madisen, Saralynn, and Larry every other weekend from Friday at 5 p.m. until Sunday at 8 p.m., and "week-on/week-off" parenting time in the summer; his plan also established a holiday parenting time schedule.

### (b) District Court's Ruling

The district court found that Erin failed to establish, by a preponderance of the evidence, that Kip had been physically or verbally abusive to the children. The court also found that Erin engaged in parental alienation tactics, had not encouraged or required Madisen or Saralynn to attend parenting time with Kip, and had been unwilling to share information about the children with Kip. Additionally,

> [Erin] chaperoned dates between Madisen and an adult [male] . . . ; ultimately, crime(s) were perpetrated as a result of the contact between the two. [Erin] has also placed Madisen in a situation in which she would have contact with a former abuser. Finally, [Erin] testified that she did not check into the nature of the crimes committed by Matthew Taylor before he moved in with her and the parties' children. Perhaps Mr. Taylor's crimes do not relate to anything that would put the children at risk. His crimes are not in evidence . . . . However,

the questioning of [Erin] at trial as to Mr. Taylor's criminal history is relevant to show that [Erin] is not parenting with due diligence. A reasonable and prudent parent would inquire as to the nature of the crimes in order to make a determination as to whether they were crimes of the type which might put the children at risk.

The court found the relationship between Kip and Skylar had deteriorated to the point that what was in Skylar's best interests was not the same as what was in the other children's best interests; the court also noted that Skylar would be an adult in the near future.

The district court awarded Erin sole physical custody of Skylar (17 years old at the time), and Kip was not to have any parenting time with Skylar unless agreed upon by the parties or Skylar. But the court awarded sole physical custody of Madisen (16 years old), Saralynn (13 years old), and Larry (9 years old) to Kip, subject to Erin's reasonable rights of parenting time. Erin was to have parenting time with Madisen, Saralynn, and Larry every other weekend from Friday at 5 p.m. until Sunday at 8 p.m. during the school year, and alternating weeks during the summer; a holiday parenting time schedule was also established.

(c) Applicable Law

Keeping the evidence and the district court's findings in mind, we now consider the legal principles governing custody and parenting time matters. When deciding custody issues, the court's paramount concern is the child's best interests. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Kashyap v. Kashyap, supra.*

- 10 -

(d) Did District Court Abuse Its Discretion?

Erin claims the district court's findings are not supported by the evidence. According to Erin, the award of custody to Kip was not in the best interests of the children for "many reasons," including (1) "the lack of a close parent-child relationship of Madisen and Saralynn with [Kip]" and their wishes to not live with Kip as expressed in counseling; (2) Kip's "unwillingness to provide proper structure, discipline and control for Larry"; and (3) Kip's "prior physical, verbal and emotional abuse of Skylar." Brief for appellant at 16. She also takes issue with the court's finding that she engaged in "parental alienation tactics" without elaborating or defining what that meant, that she did not encourage or require Madisen and Saralynn to attend parenting time with Kip, and that Erin was to blame for unforeseen crimes perpetrated on Madisen. Additionally, Erin argues "that the court [splitting] up custody of these four children should not be overlooked." *Id*. at 22.

Kip argues the district court was faced with a "'he said/she said' dilemma" and ultimately accepted one version of the facts rather than another. Brief for appellee at 25.

Given the contradictory testimony in many instances, including conflicting evidence given by Erin herself, there is no question that there were credibility issues which the district court had to resolve. And when evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). Importantly, while we note that the temporary order (issued by a different judge than the trial judge) only required that the three older children "shall be encouraged" to attend parenting time with Kip, and did not require them to do so, any evidence of such encouragement by Erin is lacking in the record. Erin claimed that she encouraged the older children to go with Kip, and said, "[t]hey just don't get out" of the car and "I can't make them get from my car to his car." However, this does not reflect any effort by Erin to encourage the children to spend time with their father. Kip also claimed that "normally" Erin would just bring one child.

Further, the evidence demonstrated that Erin interfered with Kip's ability to communicate with the children by telephone. On one occasion, he asked to speak with Madisen, but Erin responded, "'She talked to you already.'" According to Kip, that also happened other times when he asked to speak to Larry. And when Kip inquired about an incident that took place at Erin's home for which a police report was taken, Erin responded, "Not your business." Erin never told Kip about a counseling appointment for Larry; her explanation was that she thought Larry had told him and that it was up to Larry to tell Kip. While we acknowledge that Erin had temporary physical custody of the children for an extended period of time preceding trial, the evidence supports the district court's determination that Erin had engaged in parental alienation tactics and failed to encourage parenting time between the children and Kip. Such actions and attitudes can certainly be considered by a trial court when making decisions about the best interests of children. The evidence also supports that Skylar's aggressive behaviors in the home with other children present caused Saralynn on one occasion to call her mother on her cell phone and tell her, "Mom, I'm scared." There was also other concerning evidence regarding Skylar's actions towards Larry and

the girls. Under such circumstances, it is understandable why the district court determined a split custody arrangement was in all the children's best interests.

In light of the evidence presented as described above, and giving deference, as we must, to the district court who heard and observed the witnesses, we find the district court did not abuse its discretion in awarding physical custody of Madisen, Saralynn, and Larry to Kip. See, *Donald v. Donald, supra* (custody determinations are initially entrusted to trial court's discretion and will be affirmed absent abuse of that discretion; when evidence is in conflict, appellate court considers, and may give weight to, fact that trial judge heard and observed witnesses and accepted one version of facts rather than another). See, also, *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012) (it is sound public policy to keep siblings together when marriage is dissolved, but ultimate test remains best interests of children).

As to Erin's argument that the district court did not award her a reasonable amount of parenting time, we note that she was awarded an amount of parenting time similar to what she proposed for Kip in the event she was awarded custody of the children. We find no abuse of discretion in the amount of parenting time awarded to Erin.

## 2. CHILD SUPPORT

There is no dispute about the total monthly incomes attributed to the parties ($1,875.08 for Erin and $5,387.65 for Kip). However, the parties agree that the district court miscalculated Kip's retirement and health insurance in its calculation of child support.

### (a) Retirement Deduction

The district court calculated Kip's retirement deduction using 26 pay periods per year. The parties agree that it should have been calculated using 24 pay periods per year. Accordingly, Kip's retirement deduction should be $580.14 ($290.07 per pay period × 24 pay periods ÷ 12 months), instead of $628.49 ($290.07 per pay period × 26 pay periods ÷ 12 months) as calculated by the district court.

### (b) Health Insurance

Kip's pay stub reflects that $228.89 is deducted for health insurance; and the parties agree that the premium is deducted from one paycheck each month. The district court calculated Kip's health insurance using 26 pay periods per year, rather than 12. Its calculation was as follows: $228.89 × 26 pay periods ÷ 12 months = $495.93 per month for health insurance coverage. On the child support worksheet, the district court put the entire $495.93 on Kip's line 8, "Health Insurance Premium for Children"; $0 was listed on line 2.f, "Health Insurance Premium for Parent."

Erin claims that Kip provided "no evidence as to what part of that premium is attributable to the children." Brief for appellant at 32. She cites to Neb. Ct. R. § 4-215 (rev. 2011) which provides:

> (A) Health Insurance. The increased cost to the parent for health insurance for the child(ren) of the parent shall be prorated between the parents. When worksheet 1 is used, it shall be added to the monthly support from line 7, then prorated between the parents to arrive at each party's share of monthly support on line 10 of worksheet 1. *The parent*

*requesting an adjustment for health insurance premiums must submit proof of the cost for health insurance coverage of the child(ren). The parent paying the premium receives a credit against his or her share of the monthly support.* If not otherwise specified in the support order, "health insurance" includes coverage for medical, dental, orthodontic, optometric, substance abuse, and mental health treatment.

(Emphasis supplied.) Erin contends, "Without such proof, the deduction should be entered only on line 2.f of the child support calculation." Brief for appellant at 32. However, in her own proposed child support calculation (exhibit 17), Erin listed $228.89 on Kip's line 8, "Health Insurance Premium for Children"; $0 was listed on line 2.f, "Health Insurance Premium for Parent." This is precisely the figure used by the district court to calculate the premiums; its error was in the number of pay periods it then applied to that figure. A party cannot complain of error which the party has invited the court to commit. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014).

Accordingly, Kip's line 8, "Health Insurance Premium for Children" should be $228.89, instead of $495.93 as calculated by the district court.

### (c) Remand for New Child Support Calculation

We remand this matter to the district court for the sole purpose of recalculating and modifying Erin's child support obligation using the following revised amounts in the child support worksheets: $580.14 retirement deduction for Kip (instead of $628.49 previously used) and a credit of $228.89 for Kip for the children's health insurance premium (instead of $495.93 previously used).

### 3. MARITAL ESTATE

Erin argues the district court abused its discretion by not making an equitable division of the marital estate. In particular, she challenges the court's valuation of a vehicle awarded to her, and its decision to not require an equalization payment from Kip.

### (a) GMC Acadia

Erin testified she had a 2008 GMC Acadia that she was still paying off. She prepared a Kelley Blue Book valuation for that vehicle (exhibit 19). The exhibit shows that the "[p]rivate [p]arty [v]alue" for a "2008 GMC Acadia SLT Sport Utility 4D" near Ashland with 110,000 miles and in "[v]ery] [g]ood" condition, ranged from $7,339 to $10,256, with a mid-range value of $8,798. At trial, Erin testified that the vehicle now had 135,000 miles.

Kip prepared a "NADAguides Value Report" (exhibit 71) for Erin's vehicle that was purchased during the marriage. The exhibit shows that the "[c]lean [r]etail" price for a "2008 GMC Acadia Wagon 4D SLT AWD" with 103,000 miles and specified options was $11,500.

On exhibits 28 and 131, "Exhibit A Property Statement[s]" with proposed values for assets and liabilities, Erin's proposed value for the GMC Acadia was $8,798 and Kip's proposed value was $11,500.

The district court ultimately valued the vehicle at $11,500 based on the "Retail price (Ex. 71)." Erin claims this was an overvaluation because "$11,500.00 . . . was the highest Clean Retail

value listed on the NADAguides Value Report," and her offered value of $8,798 "was more accurate and a private party value." Brief for appellant at 32. She also states that using her value of $8,798 would "be consistent with the value for [Kip's] 2005 Ford F250 that the court used, which was a private party value." *Id*. However, Kip contends the value of 2005 Ford F-250 "was by stipulation," and it was the court's "prerogative" to use Kip's valuation for the GMC Acadia. Brief for appellee at 41. It is true that both parties listed an identical value for the 2005 Ford F-250, thus the value of that vehicle was not in dispute. However, the value of the 2008 GMC Acadia was in dispute. And we find no abuse of discretion in the district court's valuation of the 2008 GMC Acadia. See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017) (when evidence is in conflict, appellate court considers, and may give weight to, fact that trial judge heard and observed witnesses and accepted one version of facts rather than another).

### (b) Equalization Payment

Erin argues the district court should have required Kip to make an equalization payment to her. Nebraska law does not require an equal distribution of the marital estate. As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Unfortunately, Erin and Kip had a marital estate with a negative value (negative $10,850.10). Pursuant to the decree, Erin was awarded a net marital estate of negative $8,352.25 and Kip was awarded a net marital estate of negative $2,497.85; this does not quite fall within a one-third to one-half division. The district court stated, "Because the net marital estate for each party is negative, and because [Erin] is receiving a portion of [Kip's] Tier 2 [railroad] retirement benefits, no cash equalization payment is awarded in this case." We also note that Kip's allocation of the significant marital debt was almost $2,000 more than Erin's share; his lesser negative net marital estate is largely due to the fact that he was awarded a couple older vehicles with a combined value of just above $5,000. Under the circumstances of this case, we cannot say the district court abused its discretion when it did not order an equalization payment from Kip.

### VI. CONCLUSION

For the reasons stated above, we affirm the decree, but remand to the district court with directions to modify Erin's child support obligation using the revised figures noted above for Kip's retirement deduction and the children's health insurance premium.

AFFIRMED IN PART, AND IN PART
REMANDED WITH DIRECTIONS.