IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

GURNSEY V. GURNSEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KALAI M. GURNSEY, APPELLEE,

V.

NOLAN C. GURNSEY, APPELLANT.

Filed September 26, 2023.    No. A-22-875.

Appeal from the District Court for Lincoln County: MICHAEL E. PICCOLO, Judge. Affirmed.

James C. Bocott, of Law Office of James C. Bocott, P.C., L.L.O., for appellant.

Chawnta Durham, of C. Durham Law Office, L.L.C., for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Nolan C. Gurnsey appeals from the decree of dissolution entered by the district court of Lincoln County, dissolving his marriage to Kalai M. Gurnsey. Nolan challenges the decree's award of legal and physical custody of the parties' three minor children to Kalai. Nolan also contends that the district court erred in denying his motions for in camera interviews with two of the children. For the following reasons, we affirm.

## II. STATEMENT OF FACTS

Nolan and Kalai were married in 2008 and together have three children: Ryan, born in 2009; Emmersyn, born in 2010; and Liam, born in 2018. Kalai filed a complaint for dissolution of marriage in November 2019, and Nolan filed an answer in December. In their respective filings, both parties requested sole custody of their children subject to the reasonable parenting time of the other parent.

- 1 -

## 1. PRETRIAL PROCEEDINGS

The district court entered an order on December 20, 2019, awarding temporary legal and physical custody of the children to Kalai. The court's order also incorporated a parenting plan, which awarded Nolan weekend parenting time every other weekend from Thursday evening to Monday morning, alternating with weeknight parenting time on Wednesday during the "off week." The temporary parenting plan also awarded Nolan parenting time during half of the children's school summer break and during various holidays.

On April 25, 2022, Nolan filed a motion for an in camera interview of the minor children. The motion alleged that the children were of a sufficient age and maturity to articulate their preferences and that the district court should consider this evidence when making its determination regarding custody and parenting time, and that the interview was in the children's best interests.

In an order filed the following day, the district court stated that the dissolution trial began on April 26, 2022. This first day of trial is not included in our bill of exceptions. The order noted that Nolan's motion for an in camera interview was argued and subsequently denied by the court. Trial was continued until May 11 and the court ordered that any additional pretrial motions must be filed no later than May 4, to be heard telephonically on May 9.

On May 4, 2022, Nolan filed another motion for an in camera interview of the minor children, making identical allegations as his first motion filed on April 25. At the May 9 hearing on the matter, Nolan argued that the children had expressed a desire for a 50/50 custody arrangement and equal time with both parents, and that he was seeking an opportunity for the children to express this desire to the district court. Nolan stated that if the court were to overrule the motion, he would make an offer of proof at the trial. Nolan clarified that his motion for an in camera interview related only to the parties' two older children, Ryan and Emmersyn.

Kalai offered an affidavit with an attachment in response to Nolan's motion for an in camera interview. Kalai's affidavit stated that she did not believe it was in the children's best interests to be interviewed in camera given their young ages and that becoming a part of the proceedings would be emotionally burdensome. The affidavit also noted that Ryan suffers from generalized anxiety disorder and has been in therapy for the past 2 years. At Ryan's last therapy session on May 4, Kalai received progress notes from Ryan's therapist stating that Ryan had expressed an unwillingness to participate in court proceedings. The progress notes from Ryan's therapist detailing his May 4 session were attached to Kalai's affidavit. The therapist reported that Ryan had high anxiety about his parents' trial, that he did not want to talk to any attorneys or the court, and that it would be in "Ryan's best interests to remain out of the custody matter and/or off the stand in the court room." The progress notes also state that Ryan had expressed a custody preference to his therapist: "he wants the schedule to remain the same as it is."

Nolan objected to the affidavit and attachment on the basis of hearsay and foundation, and the district court received the exhibit subject to its review of Nolan's objections. The court took the matter under advisement. In an order dated May 9, 2022, but not filed until April 19, 2023, the court overruled Nolan's motion for an in camera interview of the two oldest children.

## 2. TRIAL

The continued dissolution trial was held on May 11, 2022. The primary issue before the district court was the legal and physical custody of the children. Kalai requested sole legal and

physical custody of the children subject to Nolan's reasonable parenting time. Nolan requested that he and Kalai be awarded joint legal custody and an equal share of physical custody in a 50/50 arrangement.

At the beginning of the trial, Nolan's attorney inquired about his pretrial motion for an in camera interview of the children, as he had not yet seen an order from the district court. The court responded that it had decided the issue and that counsel should have received a faxed copy of the order. The court stated that it had decided the 12-year-old Ryan to be "pretty young" for the court to interview. The court went on to note that dissolution proceedings can be challenging for children, and it was the court's usual position not to discuss the case with them.

Prior to Nolan's testimony, he made an offer of proof regarding the testimony of the children. Nolan stated that if the two older children were called to testify, he believed their testimony would be that they wanted equal time with both parents and that they would not testify "with regard to the legal aspect of things." Kalai responded that Nolan's offer of proof was contradicted by the progress notes authored by Ryan's therapist. The district court again overruled Nolan's request to have an in camera interview. The court then heard testimony from Kalai, Nolan, and several family members.

(a) Employment and Family Relocations

At the time of the parties' marriage, Kalai was 18 years old and Nolan was 27. For the first 2 years of the marriage Kalai and Nolan lived in Bassett, Nebraska, where Nolan was working as a licensed practical nurse. Kalai had been homeschooled but had not received a high school diploma or a GED. Kalai worked at a gas station part time for the first few months of the marriage but stopped when she became pregnant. When Ryan was born in July 2009, Kalai and Nolan agreed to an arrangement where Nolan would work outside the home and Kalai would be a stay-at-home mother.

The parties moved to Lincoln, Nebraska in the summer of 2010, when Kalai was pregnant with Emmersyn, so that Nolan could obtain his registered nurse credentials. Nolan worked part time while in nursing school and participated in extracurricular activities, such as the student council and various nursing boards. In 2012, Kalai obtained her GED and enrolled in an associate degree program in the fall. However, in the spring of 2013, halfway through Kalai's second semester, Nolan informed Kalai that as soon as he graduated from his registered nursing program in May the family would be moving back to Bassett. Kalai testified that Nolan did not discuss moving the family with her and that she had no input in the decision.

The family moved back to Bassett in July 2013 and Kalai did not complete her associate degree. After sitting for his nursing boards in September, Nolan worked full time as a director of nursing for 9 months. He then began working a nursing night shift to allow him to spend more time with the family. Nolan testified that Kalai asked Nolan to be home with the family at night and in 2015, Nolan began working as a travel nurse and as an interim director of nursing for a different facility. Nolan was away from the home for 3 days a week when working as a travel nurse once or twice a month.

The family moved to Imperial, Nebraska, in July 2015, so that Nolan could begin working full time as the administrator of a nursing home. Nolan also worked as a travel nurse during this

time. While in Imperial, Kalai homeschooled Ryan and Emmersyn for preschool and part of kindergarten and later enrolled the children at their local public school in January 2017.

In March 2017, Nolan accepted the role of administrator of a nursing home in North Platte, Nebraska, and the family moved again. Nolan worked full time as an administrator and as a travel nurse a few weekends a month. Because Ryan and Emmersyn were enrolled in school, Kalai began working part time as a materials stocker at a hospital in April 2017. In September 2017, when Kalai was pregnant with Liam, she had to take medical leave from her position due to complications with the pregnancy. Kalai never returned to her position and the 5-month period in 2017 and a few months in 2008 are the only times Kalai had worked outside of the home during the parties' marriage.

Though Kalai testified that she and Nolan shared many of the household duties, the majority of the childcare fell to her as Nolan was working outside of the home. Kalai described suffering from migraines since she was a teenager and being diagnosed with fibromyalgia in 2016. Kalai was presently engaged in treatment which successfully managed her health conditions. Kalai denied that her health issues had ever rendered her unfit to care for the children or currently prevented her from working or being a student. Nolan testified to providing the majority of the childcare during the periods where Kalai's migraines were debilitating.

At the time of trial Kalai was enrolled in community college and taking prerequisite classes to apply for a nursing program. Kalai had enrolled the parties' youngest child, Liam, in daycare to allow her to attend classes as a full-time student. Nolan had recently become the administrator of another nursing home in North Platte, where he had negotiated having 6 days off every 2 weeks to accommodate time with the children.

(b) Medical Care Differences

The parties expressed oppositional points of view related to their children's medical care. The parties' oldest child, Ryan, has been seeing a therapist for the past 2 years and had been diagnosed with generalized anxiety disorder, depression, and ADHD. Roughly 18 months before trial, Ryan expressed suicidal ideations to his therapist, who referred Ryan to a pediatrician for treatment of his anxiety and depression. The pediatrician prescribed Zoloft and had recently prescribed additional medications to help with Ryan's ADHD and insomnia. Ryan has continued taking Zoloft since it was prescribed, he meets with the pediatrician every 4 weeks for medication management, and he sees his therapist twice a month to work on additional coping skills. The parties' second child, Emmersyn, has been taking a thyroid medication for 1 year.

Kalai testified that it was in both Ryan's and Emmersyn's best interests to continue taking their medications as prescribed. Kalai found that Ryan responded well to the medication, including a greater interest and enjoyment in school and fewer emotional outbursts. Ryan has not expressed suicidal ideations since he was prescribed Zoloft. She noted that if Nolan were to make medical decisions on behalf of the children, it was likely that Nolan would discontinue Ryan's medication regime. Kalai takes the children to their medical appointments and does not provide Nolan with notice of the appointments. Kalai was unsure whether she would consult Nolan regarding medical decision making, stating that Nolan does not compromise or consider Kalai's input on the matter.

Nolan testified to his concerns regarding the effects of Zoloft on children. Based on his research on the Mayo Clinic's website, children who take Zoloft can experience weight loss, the

inability to focus, and dependency on antidepressants later in life. Nolan had observed Ryan to be smaller than his classmates and that his weight has not increased during the time he has been taking Zoloft. Over a year after Ryan had first been prescribed Zoloft, Nolan met with Ryan's pediatrician to express his concerns. However, after their meeting Ryan remained on the medication and Nolan did not seek out any additional medical appointments for Ryan. Nolan testified that Kalai was overmedicating Ryan and that following the recommendations of Ryan's providers did not constitute "informed medical decisions."

Kalai testified that Nolan also disagreed with Kalai's decision to vaccinate the children, including vaccinations against COVID-19. Nolan testified that he found the risk of the children contracting COVID-19 to be low compared to the wide variety of vaccine side effects. Nolan also believed that all vaccines in general should be "cautioned in youth," and that if he had sole medical decision making the children would remain unvaccinated. Up until the time of parties' separation the children had not received any vaccinations.

On cross examination Kalai was asked about the extent to which she researched the side effects of her children's medication and the COVID-19 vaccine. Kalai testified to doing some of her own research but ultimately deferring to her children's doctors who have "much more extensive knowledge than I would or that I would be able to Google."

Kalai also believed that Nolan did not provide adequate medical care for the children while they were in his custody. In early 2020, Nolan hit an animal on the road while the children were in the car. Emmersyn was not wearing a seat belt and hit the car's dashboard. Nolan did not inform Kalai of the accident and dropped Ryan and Emmersyn off at school. Kalai took the children to the emergency room to be assessed and no medical issues were detected.

Another time Ryan complained to Kalai about being hit in the head while playing at a church event during Nolan's Wednesday overnight. Kalai told Nolan to take Ryan to the doctor where he was diagnosed with a concussion. Kalai kept Ryan home from school for a week as a precaution. Nolan did not provide any testimony regarding these two events.

(c) Religious Differences

During the marriage, the parties' religious beliefs were fairly consistent with one another, and the family regularly attended church. Kalai testified that Nolan held conservative Christian beliefs regarding the issues of modesty and homosexuality, and Nolan agreed that he considers homosexuality to be a sin. Since the separation, Kalai no longer identifies as a Christian but believes in "equality and acceptance." Nolan testified to wanting to provide a "biblical understanding" of the world to his children.

This religious tension between Kalai and Nolan became more prominent when, in the last year, Emmersyn began identifying as bisexual. Kalai accepted Emmersyn's sexual orientation, even allowing her to hang a Pride flag in her bedroom. Kalai overheard a video call conversation between Emmersyn and Nolan where Nolan told Emmersyn that the Bible prohibited homosexuality and that her being bisexual was not an acceptable lifestyle. Emmersyn became very upset, bursting into tears and yelling at Nolan over the video call.

Nolan testified that though his religious beliefs on homosexuality were steadfast, he believes that one can share differences and still be respectful and compassionate. Nolan testified consistently with Kalai's description of his video call with Emmersyn concerning her sexual

identity. But Nolan noted that he and Emmersyn have had additional conversations since their video call where Nolan has reiterated that while he does not approve of Emmersyn's choice, he nonetheless loves her. Emmersyn has continued coming to Nolan with concerns and Nolan believes their relationship has remained positive.

### (d) Communication Issues and Protection Order

Kalai testified that Nolan sent her frequent, mean text messages during a contentious time in the proceedings. Text messages between Kalai and Nolan from October 2020 to March 2021 were entered into evidence. In the text messages Nolan regularly brings up his desire to have 50/50 physical custody of the children, calls Kalai "greedy," "selfish," "immoral," "pathetic," and "an adulterous whore," and accuses Kalai of putting Liam in daycare because she does not want to spend time with him. Kalai noted that the offered text messages were not the only messages received from Nolan during the 5-month window but highlighted the difficulties in the parties' communication.

Kalai filed a petition and affidavit to obtain a harassment protection order against Nolan on March 19, 2021. Attached to her petition was a timeline of correspondence between Kalai and Nolan from October 2020 to March 2021, which outlines the text messages offered to the district court at trial. Kalai describes making requests that Nolan contact her solely through her attorney and Nolan ignoring her requests and continuing to "harass [Kalai] through texts, calling and in-person at drop off and pickups." Also attached to the petition are two letters from Kalai's attorney to Nolan, dated January and February 2021, directing Nolan to contact Kalai's attorney and not Kalai regarding any issues with the case. On March 22, the district court granted Kalai an ex parte harassment protection order against Nolan.

Nolan filed a request for a hearing on the protection order and at the hearing held on April 20, 2021, Nolan requested a continuance to hire an attorney. The district court granted the continuance and ordered that the attorneys should contact the court's bailiff to schedule a new hearing date. Though Nolan retained an attorney, the protection order's trial docket reflects that no hearing was ever scheduled. The ex parte order expired on March 22, 2022. Prior to that, all communication between the parties went through a third party, Kalai's mother.

### (e) Temporary Custody Arrangement

In the temporary custody order, Nolan's parenting time included four overnights, Thursday to Monday morning, every other week, and an additional Wednesday evening until 8 p.m. in the alternate week. However, both parties mistakenly believed that the order awarded Nolan parenting time every Wednesday night. Nolan moved from North Platte to Sutherland, Nebraska, about 20 miles away, a few months after the district court entered the temporary custody award. Kalai found that the children struggled with having to drive back late in the evening on a school night, so she offered Nolan to keep the children overnight on Wednesdays and drop them off at daycare or school the next morning.

Though Nolan had been having the children for overnight parenting time every Wednesday, Kalai did not want the parties' temporary agreement to be made part of the decree. The parties had been experiencing some communication issues and the multiple transitions during the week had been challenging for the children. Additionally, on weeks where Nolan had to work

early on Thursday morning, he would drop the children back off at Kalai's at 8 p.m. on Wednesday evening. Kalai believed that Nolan was not taking full advantage of the parenting time offered to him.

Nolan testified that he wanted a 50/50 physical custody arrangement. He believed that a week on, week off arrangement would minimize disruptions for the children. Nolan also stated that his current position allows him to take 6 days off every 2 weeks to accommodate his parenting time with the children, and that he had the flexibility necessary for his proposed schedule.

Kalai expressed concerns regarding the 50/50 custody arrangement proposed by Nolan. Her concerns included Nolan's availability with his demanding administrative role, the children frequently not having done their homework at Nolan's, and Nolan's inconsistency in administering the children's medication. Kalai described instances where medication was forgotten at Nolan's home when he took the children to visit his parents in Bassett, Nolan losing Ryan's medicine bottle and Kalai having to go to the pharmacy to obtain an emergency refill, and Kalai bringing Ryan's medication to him at school because Nolan had forgotten to administer it during a Wednesday overnight visit. Kalai estimated there was an issue with the children's medication during every weekend Nolan had parenting time.

Regarding the possibility of shared legal custody, Kalai was concerned about how the parties would come to decisions and compromises on parenting issues due to their differing views. Kalai noted that Nolan infrequently made decisions with her or considered her viewpoint during their marriage. Nolan stated that he would be a willing coparent with Kalai and would make decisions with her regarding the children. On cross examination, Nolan conceded that he had spoken with the children about their testifying at trial and later informed them that Kalai had disallowed their providing testimony.

### (f) Additional Testimony

Testimony was also provided by various members of Nolan's and Kalai's family. Nolan's brothers and sister testified that Nolan was a devoted father. Kalai's grandmother testified that she found both Kalai and Nolan to be good parents but had not spent a significant amount of time observing their parenting skills. Kalai's mother and Nolan's former sister-in-law testified that Kalai was a devoted mother, and that Nolan was a harsh disciplinarian.

### 3. DECREE

On July 22, 2022, the district court entered a decree of dissolution awarding Kalai legal and physical custody of the children subject to Nolan's parenting time. The court found that during the parties' marriage, Kalai was the primary caregiver and had forgone her own educational and professional pursuits to remain in the home. Additionally, the family had moved several times to pursue Nolan's educational and professional pursuits. The court acknowledged that Nolan also played a notable parental role in the family and ordered the same parenting plan as it had in its temporary order; awarding Nolan weekend parenting time every other weekend from Thursday evening to Monday morning, alternating with weeknight parenting time on the alternate Wednesdays.

Regarding the decree's award of full legal custody of the children to Kalai, the district court stated:

> The evidence adduced at trial clearly established that Kalai and Nolan are philosophically, religiously, and morally incompatible, which frustrates collaboration on key issues affecting their children. Consequently, their past skirmishes over vital matters involving their children coupled with their conflicting values and beliefs would only exasperate their ability to effectively co-parent. Furthermore, the Court could reasonably conclude that those unresolved family decisions—due to the parents' oppositional interactions—could have an unwanted, or, at least, undesired harmful effect on their children.

The court specifically noted the parties' disagreements regarding medical treatment, vaccines, the administration of medication, and religion and found that it was not in the children's best interest for Kalai and Nolan to share joint legal custody.

Nolan appeals.

## III. ASSIGNMENTS OF ERROR

Nolan assigns that the district court erred in (1) denying his motions for in camera interviews of the two elder children; and (2) finding it was in the children's best interests to award Kalai sole legal and physical custody and reduce Nolan's parenting time from that established by the parties' voluntary agreement made during the period of temporary custody.

## IV. STANDARD OF REVIEW

A trial court's ruling on a motion to conduct an in camera interview of a minor child in custody proceedings is reviewed for an abuse of discretion. See *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009).

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. DENIAL OF IN CAMERA INTERVIEW

Nolan first assigns that the district court erred in denying his motions for an in camera interview of Ryan and Emmersyn, who were 12 and 11 years old at the time of trial. Nolan argues that the district court was required to conduct an in camera interview in order to consider the desires and wishes of the children, a factor set forth by Neb. Rev. Stat. § 43-2923(6) (Reissue 2016).

The child's best interests require a parenting arrangement and plan which provides for a child's safety, emotional growth, health, stability, physical care, and regular and continuous school attendance and progress. See § 43-2923. Moreover, § 43-2923 sets forth a non-exhaustive list of

factors to be considered in determining the best interests of a child in regard to custody. Specifically, regarding the desires of a minor child, the statute provides that the court should consider "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." § 43-2923(6)(b). The Nebraska Supreme Court in applying this provision has stated that while the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). The Supreme Court has also found that in cases where the minor child's preference was given significant consideration, the child was usually over 10 years of age. *Id*.

Nolan filed two motions for an in camera interview of the children, both of which were denied by the district court. In response to Nolan's second motion for an in camera interview, Kalai presented an affidavit with attached therapeutic progress notes relating to Ryan. The progress notes detailed Ryan's anxiety disorder and his unwillingness to discuss custody with any attorneys or the court. At a May 4, 2022, session Ryan had exhibited signs of high anxiety regarding his parents' upcoming trial. Ryan's therapist of 2 years concluded in the progress notes that Ryan's participation in the trial in any way was not in his best interests.

Whether or not to allow a young child to testify in his or her parent's divorce trial is a fact-specific inquiry and depends upon the circumstances of the case. See *Vogel v. Vogel, supra*. Although Ryan was 12 years old at the time of trial, he also had a diagnosed anxiety disorder. Considering Ryan's history of mental health concerns and his vocalized distress regarding his potential participation in the family's custody matter, the district court's reluctance to conduct an in camera interview under these circumstances was a proper exercise of its discretion. Additionally, this court has previously held that it was not an abuse of discretion for a trial court to deny a request for an in camera interview due to a child's health condition and resulting limitations. See *McClure v. McClure*, No. A-17-664, 2018 WL 1169654 (Neb. App. Mar. 6, 2018) (selected for posting to court website) (finding that district court appropriately considered child's Autism when assessing § 43-2923(6)(b)).

We cannot say that the district court abused its discretion in denying Nolan's motions for an in camera interview of Ryan and Emmersyn.

## 2. CUSTODY DETERMINATION

Nolan also assigns that the district court erred in finding that it was in the children's best interests to award Kalai sole legal and physical custody and reduce Nolan's parenting time from that established by the parties' voluntary agreement made during the period of temporary custody. Nolan argues that "Kalai's ignorance concerning medical and moral issues does not further the best interests of the child." Brief for appellant at 26. He additionally contends that the temporary parenting time arrangement that afforded him 6 overnight visits every 2 weeks was working well for the family and argues that this voluntary physical custody arrangement should have been included in the decree. In the alternative, Nolan argues that the district court should have awarded the parties 50/50 joint physical custody.

Before addressing Nolan's arguments, we consider the legal principles governing custody and parenting time matters. When deciding custody issues, the court's paramount concern is the

child's best interests. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). Section 43-2923(6) states, in part:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> > (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
> >
> > (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
> >
> > (c) The general health, welfare, and social behavior of the minor child;
> >
> > (d) Credible evidence of abuse inflicted on any family or household member. . . . ;
>
> and
>
> > (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Kashyap v. Kashyap, supra*.

### (a) Legal Custody

The evidence presented at trial demonstrated that the parties have struggled to communicate with one another in a constructive manner. Kalai offered text message exchanges between her and Nolan from October 2020 to March 2021 in which Nolan repeatedly insults Kalai and relays his desire for a 50/50 custody arrangement. Nolan continued to text message Kalai even after he was told by both Kalai and her attorney to stop discussing the case with Kalai. These problems led Kalai to secure an ex parte harassment protection order against Nolan, which remained in place for one year; or nearly half of the parties' separation. During this time, all communication between Kalai and Nolan went through Kalai's mother.

Additionally, Kalai testified that Nolan did not seek or consider her opinion when making family decisions during their marriage and he struggled to make compromises regarding child-related decisions. Kalai was concerned that the parties would be unable to come to a consensus on parenting issues due to their differing views. In its decree, the district court specifically noted the parties' opposing views on medical and religious issues and stated that disagreement between Nolan and Kalai could have a harmful effect on the children.

The Parenting Act defines "[j]oint legal custody" as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Nebraska courts typically do not award joint legal custody when the parties are unable to communicate effectively. See, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decision making by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of

discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another).

Further, trial evidence demonstrated that Kalai was making sound decisions regarding proper care to the children. Kalai was responsible for taking the children to their medical appointments and was deferring to the children's physicians and licensed mental health practitioners regarding their respective treatment regimes. Though Kalai was no longer a member of an institutionalized religion, she articulated the morals she sought to instill in her children and clearly provided them with consistent emotional support. We also note the evidence that Nolan involved the children in the legal proceedings when he told them that Kalai was the one who would not allow them to be interviewed.

Given the history of communication issues and decision making differences between the parties, we cannot say that the district court abused its discretion in awarding Kalai sole legal custody of the children.

(b) Physical Custody

The district court awarded Kalai sole physical custody of the children and ordered the same parenting plan as it had in its temporary order, granting Nolan weekend parenting time every other weekend from Thursday evening to Monday morning, alternating with weeknight parenting time on the alternate Wednesdays until 8 p.m. Nolan was also awarded extended parenting time during half of the children's school summer break and during various holidays.

Our review of the record supports the district court's findings that Kalai was the primary caregiver during the parties' marriage. Kalai was a stay-at-home mother during most of the parties' marriage. Kalai and Nolan moved four times during their marriage, each time for Nolan's educational and professional advancement. The family's moves interrupted Kalai's associate degree program, and she did not return to school until after the parties separated. Kalai had worked outside of the home only for a few months in 2008 and 2017.

The record shows that Kalai has been consistent in providing for the children's care, including their medical care and educational needs. Though the evidence demonstrates that Nolan was an involved father to the children when at home, his work has taken him away from the home a significant amount of time. During the parties' separation, Nolan has been inconsistent in administering Ryan's medication and ensuring that the children complete their homework while in his care.

We cannot say it was an abuse of discretion for the district court not to order a 50/50 joint custody arrangement. We also find no abuse of discretion in the parenting time awarded to Nolan, which was the same as provided in the temporary order. Although Nolan argues that he should have been provided overnight visits every Wednesday as voluntarily followed by the parties during the separation, there was evidence that Nolan did not always avail himself of the Wednesday overnights and would on occasion bring the children back to Kalai's home on Wednesday evening. We find no abuse of discretion in the district court's determination of Nolan's parenting time. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019).

## VI. CONCLUSION

We conclude that the district court did not abuse its discretion when denying Nolan's motion for an in camera interview of the parties' two elder children, in awarding Kalai legal and physical custody of the children, or in its determination of parenting time. We affirm the district court's decree in all respects.

AFFIRMED.